[Civ. No. 21889. First Dist., Div. One. Aug. 9, 1965.]

ANTHONY T. WILLIAMS et al., Plaintiffs and Appellants, v. THE DAILY REVIEW, INC., et al., Defendants and Respondents.

Howard S. Burnside for Plaintiffs and Appellants.

John C. Houlihan, William J. Hayes, Hardin, Fletcher, Cook & Hayes, and Cyril Viadro for Defendants and Respondents.

MOLINARI, J.—Plaintiffs appeal from a judgment in favor of defendants, The Daily Review, Inc., a corporation, and Charles Hegg Peterson,[1] after a jury verdict in a libel action. The appeal is directed solely to the propriety of certain jury instructions.

### Statement of the Case

Plaintiffs,[2] who are engineering contractors and whose business is conducted primarily in Southern Alameda County, were, in the fall and winter of 1960-1961, engaged in paving several blocks of "A" Street in the City of Hayward. Plaintiffs were performing this work pursuant to a contract with the City of Hayward, this job having been awarded to them as the lowest bidder. Although the original contract specified that the work was to be completed by November 5, 1960, plaintiffs had requested and been granted several extensions of time (to January 25, 1961; January 30, 1961; February 9, 1961; February 13, 1961; and finally April 25, 1961), in each case without the assessment of liquidated damages. As to each of these extension requests, plaintiffs claimed that they could not complete their work until certain utilities had been relocated by the telephone company and the City of Hayward, and that neither of these two projects had been timely performed.

On February 14, 1961, during the course of a Hayward

[1]Although the complaint also named as defendants, in addition to several Does, George Lower and Floyd Sparks, the editor and the publisher and proprietor, respectively, of The Daily Review, these two defendants as well as the fictitious defendants were dismissed from the action prior to trial.

[2]Plaintiffs Anthony and Irving Williams were in 1960-1961 acting as a copartnership (Williams Brothers) and were in the process of incorporating, the corporation to bear the name Williams Brothers Construction Company, Inc.

City Council meeting, which was held to discuss matters unrelated to plaintiffs and their paving work for the City, one councilman observed that a resident of "A" Street had complained to him about the delay in completing the paving project on that street. The councilman concluded by stating " '. . . I understand they're about 30 days behind schedule on completion of this work.' " In response to this comment, Edward Phillips, Director of Public Works for the City of Hayward, made the following statement: " 'Yes, sir, Mr. Mayor, Council [*sic*] Blichfeldt. The contractor is behind schedule. We feel at this point that the work is not progressing satisfactorily. The contractor has been notified that because of his slow progress of work we feel that under the sections of the contract calling for liquidated damages that this is entirely probable in his case and urge that he recognize this fact and complete the work with due diligence. He is a little contract [*sic*]. We feel that—and he has been notified that he is subject because of this to liquidated damages.' " Councilman Blichfeldt then requested of the mayor that " 'we keep posted on this thing,' " and the mayor accordingly asked Mr. Phillips for a periodic progress report.

Peterson, a reporter for The Daily Review, which is published by defendant corporation and had at the time of this meeting a circulation of 26,498 generally in the cities and unincorporated areas of Southern Alameda County, attended the council meeting and prepared the following article, which appeared in The Daily Review on February 15, 1961:

### "A STREET WORK DELAY ATTACKED

"Another of Hayward's street paving jobs has produced a headache, both for Public Works Dept. engineers and residents along A Street east of Second Street.

"Public Works Director Edward Phillips acknowledged last night that the contractor has fallen behind schedule and has been warned that the city may assess liquidated damages for his tardiness.

"Councilman Vern Blichfeldt raised the question of delay on the job on behalf of A Street residents who have had to contend with a torn up street since last fall.

"Contractor on the project is Williams Bros., Union City, which received the contract with a bid of $80,006, some 25 per cent below the city's estimate of more than $107,000.

"The city's problems are reminiscent of an earlier situ-

ation on Tennyson Road, where a cheaply bid job dragged on for months past the original target date for its completion.

"While the city's project has languished, the county has finished widening A Street between the city limits and Grove Way, including a four-land [*sic*] bridge over San Lorenzo Creek. The two jobs started at about the same time."

On February 16, 1961, Irving Williams wrote a letter to The Daily Review notifying defendants of the alleged libelous publication and demanding a correction.[3] Defendants refused to print a retraction, whereupon plaintiffs brought the instant libel action in which they sought to recover $100,000 general damages, $15,000 special damages, and $10,000 exemplary damages.

All of plaintiffs' assignments of error on appeal deal with the instructions which the trial court gave to the jury. These assignments of error deal not only with the substance of the instructions relating to the meaning of the alleged libel and the issue of privilege, but also with the respective function and role of the court and jury in the determination of these issues.

### Instructions Relating to Whether the Publication was Defamatory

Plaintiffs contend initially that the trial court should itself have determined that the publication was libelous as a matter of law or, at least, libelous on its face and should have so instructed the jury. Because of the complexity of the law in the area of libel and the diversity of meanings to which some of the relevant terms are susceptible, we precede our discussion of this contention with a general discussion of the principles of law which govern in this area.

Libel is defined in Civil Code section 45[4] as follows: "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to injure him in his occupation."

An important distinction is made in California between defamatory language which is libelous on its face and that

---

[3]Civ. Code section 48a provides in part that where the publication of a libel is in a newspaper the plaintiff shall recover no more than special damages unless a correction is demanded and is not published.

[4]Unless otherwise indicated all statutory references are to the Civil Code.

which is not. This distinction is recognized by a 1945 statutory enactment (§ 45a) which is a codification of a rule long in force in this state. (See *Tonini* v. *Cevasco,* 114 Cal. 266, 271 [46 P. 113] ; *Schomberg* v. *Walker,* 132 Cal. 224, 227-228 [64 P. 290] ; *MacLeod* v. *Tribune Publishing Co.,* 52 Cal.2d 536, 548-549 [343 P.2d 36] ; *Babcock* v. *McClatchy Newspapers,* 82 Cal.App.2d 528, 539 [186 P.2d 737].) Section 45a provides as follows: ''A libel which is defamatory of the plaintiff without the necessity of explanatory matter, such as an inducement, innuendo or other extrinsic fact, is said to be a libel on its face. Defamatory language not libelous on its face is not actionable unless the plaintiff alleges and proves that he has suffered special damage as a proximate result thereof. Special damage is defined in Section 48a of this code.''[5]

■ It should be here noted that language may be libelous on its face even though it is susceptible of an innocent interpretation. As stated by the Supreme Court in *MacLeod*: ''The test is whether a defamatory meaning appears from the language itself without the necessity of explanation or the pleading of extrinsic facts. If it does, 'whether the charge be directly made or merely implied, the publication—without *averment, colloquium, or innuendo*—will, in itself, constitute a libel.' The fact that an implied defamatory charge or insinuation leaves room for an innocent interpretation as well does not establish that the defamatory meaning does not appear from the language itself. The language used may give rise to conflicting inferences as to the meaning intended, but when it is addressed to the public at large, it is reasonable to assume that at least some of the readers will take it in its defamatory sense.'' (P. 549.)

■ Whether a publication is libelous on its face, or, as sometimes referred to by the cases, ''libelous per se,'' is a question of law. (*Howard* v. *Southern Cal. etc. Newspapers,* 95 Cal.App.2d 580, 584 [213 P.2d 399] ; *Freeman* v. *Mills,* 97 Cal.App.2d 161, 165-166 [217 P.2d 687] ; *Mercado* v. *Hoefler,* 190 Cal.App.2d 12, 21 [11 Cal.Rptr. 787].) Where there is an ambiguity as to what the words mean, semantically, the court finding two meanings reasonably possible, one derogatory

---

[5]Section 48a, subdivision 4(b), defines ''special damages'' as follows: '' 'Special damages' are all damages which plaintiff alleges and proves that he has suffered in respect to his property, business, trade, profession or occupation, including such amounts of money as the plaintiff alleges and proves he has expended as a result of the alleged libel, and no other; . . .''

and the other not, the law hypothesizes a single readership mentality and the inference by the entirety of that readership of only one of the two meanings. (*Herrmann* v. *Newark Morning Ledger Co.*, 49 N.J. Super. 551 [140 A.2d 529, 530].) Accordingly, when a court determines that certain language is reasonably susceptible on its face to a defamatory meaning but that the language is also susceptible of an innocent interpretation, the court decides, in the first instance, that the language is actionable per se, and it then becomes the jury's function from the evidence to determine which of the two potential meanings was drawn by the readership. (*MacLeod* v. *Tribune Publishing Co.*, *supra*, p. 546; *Maidman* v. *Jewish Publications, Inc.*, 54 Cal.2d 643, 651 [7 Cal. Rptr. 617, 355 P.2d 265, 87 A.L.R.2d 439]; *Herrmann* v. *Newark Morning Ledger Co.*, *supra*, p. 530 [140 A.2d].)

It is only when the language is susceptible solely of a defamatory meaning, and it is not possible for a jury to determine that the publication was used and understood in a nondefamatory way, that it would be proper for a trial court to resolve the issue of libel (aside from *the issues of truth and privilege*) in favor of a plaintiff without submitting this issue to the jury or, in other words, to determine that the publication was libelous as a matter of law. (See *Maher* v. *Devlin*, 203 Cal. 270, 278-281 [263 P. 812].)

In the light of the foregoing principles, the publication in the instant case was libelous per se. The subject article tends to injure plaintiffs' reputation with respect to their occupation. Although it contains no statement which is explicitly defamatory, the article nevertheless insinuates, without the necessity of resorting to extrinsic material, that plaintiffs were responsible for the delay in the ''A'' Street project and that they were incompetent in the preparation of their bids for the job and in the performance of the job itself. ''A defendant is liable for what is insinuated, as well as for what is stated explicitly.'' (*Bates* v. *Campbell*, 213 Cal. 438, 442 [2 P.2d 383]; *Maidman* v. *Jewish Publications, Inc.*, *supra*, p. 651.) In essence, the subject article impliedly charges plaintiffs with conduct inconsistent with the due fulfillment of what they, by virtue of their employment, had undertaken. Such a charge or insinuation has been held to be libelous per se. (*Maidman* v. *Jewish Publications, Inc.*, *supra*, p. 651.) As we have indicated, the fact that the language of a publication is susceptible to an innocent interpretation as well as a defamatory one does not preclude a trial court from

determining that the publication is libelous per se. Therefore, since the subject article is susceptible on its face of a defamatory charge against plaintiffs, the trial court should have determined that as a matter of law the article was libelous per se and should, accordingly, have instructed the jury that it was defamatory on its face.

However, the language of the subject article is such that it cannot be said that as a matter of law it could only be understood in a defamatory sense. The implied defamatory charge or insinuation is couched in language which leaves room for an innocent interpretation as well. Thus, while the language that ''The city's problems are reminiscent of an earlier situation on Tennyson Road, where a cheaply bid job dragged on for months past the original target date for its completion'' is susceptible of the meaning that the subject job was lagging because plaintiffs were incompetent in submitting a cheap bid, it is also susceptible of the meaning that the subject delay recalled to mind a previous street construction delay caused by ''a cheaply bid job. . . .'' This latter interpretation would not necessarily impel the inference that the delay in the instant case was the result of plaintiffs' low bid. Accordingly, since the subject article was also susceptible of an innocent meaning, the trial judge should have left it to the jury to determine in what sense the readers understood the article.

In the instant case, although the court instructed the jury that the article was ambiguous and susceptible of two meanings, ''one, harmless, and the other defamatory'' and that it was for the jury to determine whether its meaning was defamatory, false and unprivileged, it specifically instructed the jury that the article was not libelous on its face and, therefore, not actionable unless plaintiffs proved that they suffered special damage.[6] The instructions that the article was not libelous per se constituted error. The trial court was apparently under the impression that because the

---

[6]Among these instructions are the following: ''The Court has determined in this case that the language of the article as published is not libelous per se or, as we say, libelous on its face; but that the language of said article is ambiguous and that it is susceptible of two meanings—one, harmless, and the other defamatory.''

''Defamatory language, not libelous on its face, is not actionable, unless the plaintiffs allege and prove that they have suffered special damage, as a proximate result thereof. Special damages are all damages which plaintiffs allege and prove that they have suffered in respect to their property, business, trade, profession or occupation, including such amounts of money as the plaintiffs allege and prove they have expended as a result of the alleged libel, and no other.''

language of the article was susceptible of two meanings it could not be libelous per se. As we have already pointed out, the fact that an implied defamatory charge or insinuation leaves room for an innocent interpretation as well does not establish that the defamatory meaning does not appear from the language itself. Under the circumstances the trial court's error in giving the aforementioned instructions was prejudicial.

## The Remaining Assignments of Error

Since the judgment must be reversed, it is not incumbent upon us to consider the remaining assignments of error having to do with instructions concerning the applicable "reader test" and the issue of privilege. However, since these questions may arise at retrial, we shall, for the guidance of the trial court, proceed to discuss these assignments of error.

Plaintiffs assign as error instructions advising the jury that the standard to be applied in determining the sense in which the subject article was understood is that of the "average reader" and the "general reader."[7] The position taken by plaintiffs is that the "average reader" test is the proper one to be used initially by the court in determining whether the language is suceptible to a defamatory interpretation, but that the application of this standard ends with this determination, and "Thereafter it was a question of fact whether the language was so understood." Plaintiffs do not, however, suggest what test the jury should have been instructed to use in making this factual determination. Ap-

---

[7]These instructions read as follows: "Whether or not this newspaper account was so understood by the readers of The Hayward Daily Review is a question for the jury to determine, and the standard by which you make such a determination is the natural and probable effect of such a publication on the mind of the average newspaper reader. In the final analysis you are to determine whether it is reasonable or unreasonable to conclude that the average reader of The Hayward Daily Review inferred from the article the matters alleged by the plaintiffs in their complaint, as above stated.

"Unless you find from a preponderance of the evidence that such was the meaning conveyed to the average reader, your verdict should be in favor of the defendants irrespective of any other issue in the case."

"In determining whether or not the defendants have sustained their burden of proving the truth of the statement in the publication, you are to consider all of the evidence, and take the entire publication into consideration, and give to it that plain, ordinary usual, natural interpretation which would be usually given by the general reader. Neither the sense in which the plaintiffs may have understood it, nor the meaning which the defendants may have contemplated, is to govern you in your determination. In this case you are to look at the article alone, and regard it in the meaning in which it would ordinarily be accepted by the average man for whom it was intended."

parently it is plaintiffs' position that the jury should have been instructed that because plaintiffs produced three witnesses who testified that they understood the article in its defamatory sense the jury should have considered this testimony alone and should therefore have concluded that the publication was understood in a defamatory sense. Plaintiffs' contention on this point is entirely without merit. There is no question that the function of the court and of the jury differ in that the court determines whether an article is reasonably susceptible to a defamatory interpretation, and the jury determines whether or not it was in fact so understood. However, the test of the "average reader" is obviously applicable to both determinations, the court determining if the average reader *could* reasonably have interpreted the article in a defamatory sense, and the jury determining if he *in fact did* interpret it in such a way.

In *MacLeod,* the Supreme Court was called upon to determine whether a complaint stated a cause of action in a case wherein the alleged libel consisted of an article charging that the plaintiff was a communist sympathizer or fellow traveller. After stating that a charge of membership in the Communist Party or communist affiliation or sympathy is libelous on its face the court stated as follows: "Whether or not the article is reasonably susceptible of this interpretation is a question for the court and, if so, whether or not it was so understood is a question for the jury" (p. 546), and then reiterated the following statement from *Bates* v. *Campbell, supra,* 213 Cal. 438, 442: " ' "And in passing upon the sufficiency of such language as stating a cause of action, a court is to place itself in the situation of the hearer or reader, and determine the sense or meaning of the language of a complaint for libelous publication according to its natural and popular construction." That is to say, the publication is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the *average reader.*' " (Italics added; p. 547.) (To the same effect see *Sullivan* v. *Warner Bros. Theatres, Inc.,* 42 Cal.App.2d 660, 662 [109 P.2d 760]; *Smith* v. *Los Angeles Bookbinders Union,* 133 Cal.App.2d 486, 492-493 [284 P.2d 194]; *Western Broadcast Co.* v. *Times-Mirror Co.,* 14 Cal.App.2d 120, 124 [57 P.2d 977].) In *Megarry* v. *Norton,* 137 Cal.App.2d 581, 583 [290 P.2d 571], we find the following statement: "In determining whether words are capable of defamatory meaning, the courts will construe them according to the fair and natural meaning that will be given

them by reasonable persons of ordinary intelligence and will not consider what persons, setting themselves to work to deduce some unusual meaning, might extract from them." Although the foregoing cases were concerned with the standard to be used by a trial court in determining as a matter of law whether a publication was libelous per se, we perceive no reason why a different standard should apply to a jury in its determination as to which, of two potential meanings, was drawn by the readership. It is logical to assume that if a trial court determines that the language used is capable of a derogatory meaning on the basis of the "average reader test," such test should likewise be the standard for the jury in determining whether the language was in fact understood in such sense, or whether it was, instead, innocently interpreted.

In relation to the issue of privilege plaintiffs make two contentions: Firstly, that the trial court should have ruled on the issue of privilege as a matter of law, and, secondly, that in substance the instructions given by the trial court on this issue were erroneous.[8] In urging error with respect to these

---

[8]These instructions were as follows: "You are instructed further that the defendants, as I previously indicated in summarizing the pleadings, have raised three defenses to the complaint on file in this case, and that these defenses have been set forth in defendants' answer which was read to you at the outset of my instructions.

"The first of these defenses is truth; the second of these defenses is privilege, being a fair and true report of the proceedings of a public meeting; and the third of these defenses is also privilege, as being fair comment for the public benefit."

"You are instructed that section 47 of the Civil Code of the State of California, as the same was in effect at the time of the incident in question, read in part as follows: section 47, quote:

" (Reading):

" '47. A privileged publication or broadcast is one made . . . (5) By a fair and true report of (1) the proceedings of a public meeting, if such meeting was lawfully convened for a lawful purpose, and open to the public, or, (2) the publication of the matter complained of was for the public benefit.' (End reading.) Close quote.

"You are instructed that if you find that the article, as published, was a fair and true report of the proceedings of a public meeting, or that the publication of the matter complained of, was for public benefit, that such publication is privileged in the absence of malice."

"Defendants have also pleaded the defense of fair comment, that is, that the publication complained of was and is fair comment and criticism by a newspaper concerning a subject of interest to the public. The condition of streets, the use of them by taxpayers, and the inconvenience to taxpayers caused by delay in repair or alteration of streets, are matters in which the taxpayers of the City of Hayward were interested. Under these conditions, if the publication is not actuated by malice, it is privileged and, therefore, as such cannot render the defendants liable for damages."

instructions plaintiffs initially assert that it was error to apply the rule of "fair comment" to section 47, subdivision 5. This assertion is without merit since it is clear that the trial court did not apply the "fair comment" rule to section 47, subdivision 5. Rather, consistent with defendants' reliance on two distinct forms of privilege—that provided for in section 47, subdivision 5, and the privilege known as "fair comment" which is provided for in section 47, subdivision 3,[9]—the trial court gave separate instructions on these two forms of privilege.

Adverting to the claim that the trial court should have ruled on the issue of privilege as a matter of law, we have difficulty determining whether the thrust of plaintiffs' argument is that the trial court should have determined that privilege existed as a matter of law (an argument redounding to plaintiffs' disadvantage), or whether the court should have found that, as a matter of law, the privilege issue was not a defense which defendants were entitled to urge. The record discloses that the trial court did determine that the "fair comment" privilege existed as a matter of law, and that, as to this issue, the only determination left for the jury was whether the publication was made maliciously. This determination was a proper one and the jury was correctly. instructed. The "fair comment" privilege allows a person to make "fair comment" on matters of "public interest." (*Maidman* v. *Jewish Publications, Inc., supra,* 54 Cal.2d 643, 651-652; Prosser on Torts, (3d ed. 1964) pp. 812-816.) In California the "fair comment" privilege is encompassed within the provisions of subdivision 3 of section 47 which privileges a publication made "In a communication, without malice, to a person interested therein, (1) by one who is also interested. . . ." It has been held that this qualified privilege exists whether the publication be in the form of opinion or of false statements of fact (*Di Giorgio Fruit Corp.* v. *A.F.L.-C.I.O.,* 215 Cal.App.2d 560, 569 [30 Cal.Rptr. 350]), and that the privilege extends to a newspaper. (*Glenn* v. *Gibson,* 75 Cal. App.2d 649 [171 P.2d 118]; *Maidman* v. *Jewish Publications, Inc., supra,* pp. 651-652.)

---

[9]The pertinent portions of section 47, subd. 5, are correctly set forth as read to the jury in the instructions contained in fn. 8. Section 47, subd. 3, reads, in pertinent part, as follows: "A privileged publication . . . is one made—(3) In a communication, without malice, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information."

■ The crucial issue involved in determining the applicability of the "fair comment" privilege is whether or not the publication was made in the public interest. (Prosser, *supra*, p. 812.) In 2 Witkin, Summary of California Law (1960) section 122, pages 1295-1296, we find the following subjects listed as examples of "matters of public interest": "[T]he qualifications or conduct of public officers or candidates for office, the manner in which public or charitable institutions are administered, the merits of literary or dramatic productions, etc." The Restatement of Torts, section 607, subdivision (2), contains this statement concerning the scope of the privilege of "fair comment": "The privilege of criticism . . . includes a privilege to criticise the work of independent contractors which is being paid for out of public funds and the work of employees of such contractors." (See also cases cited in Prosser, *supra*, p. 813, fn. 55.) California has recognized this application of the "fair comment" privilege in dictum in the case of *Stevens* v. *Storke*, 191 Cal. 329, 334-335, 337 [216 P. 371]. In any event, contrary to plaintiffs' contention, the scope of the term "public interest" in California is not limited to matters relating solely to public officials. Both the cases of *Glenn* and *Maidman* applied the privilege to statements defaming private individuals, where the subject matter of the article was determined to be of public interest or the defamed individual of renown among a certain interest group. We conclude, therefore, that the publication involved in the instant case was made within the public interest, and that since all the other elements of this privilege were present, the privilege was applicable to defendants' publication. Furthermore, since the determination that this privilege of "fair comment" applied to the subject publication involved no factual issues, it was properly made by the court, thus leaving to the jury only the issue of malice. (*Carpenter* v. *Ashley*, 148 Cal. 422, 424 [83 P. 444, 7 Ann.Cas. 601]; *Freeman* v. *Mills*, *supra*, 97 Cal.App.2d 161, 166; *Adams* v. *Cameron*, 27 Cal.App. 625, 638 [150 P. 1005, 151 P. 286]; *Jones* v. *Express Publishing Co.*, 87 Cal.App. 246, 256 [262 P. 78].)

■ Insofar as the section 47, subdivision 5, privilege is concerned, the jury was not properly instructed. The trial court instructed that if it found "that the article, as published, was a fair and true report of the proceedings of a public meeting, or that the publication of the matter com-

plained of, was for public benefit, that such publication is privileged *in the absence of malice.*'' (Italics added.)

Prior to 1945 the privilege encompassed within section 47, subdivision 5, was a qualified one which could be nullified by a showing of malice. However, in 1945 the words ''without malice'' were deleted from this section by the Legislature. As a result of this deletion the privilege provided for in subdivision 5 of section 47 became an absolute privilege. Accordingly, it is apparent that as to publications claimed to be privileged under subdivision 5 of section 47 malice is not an issue and that, therefore, it was error to instruct the jury that a publication within the ambit of this subdivision is privileged in the absence of malice. By virtue of this erroneous instruction plaintiffs received a favorable instruction to which they were not entitled; hence they cannot complain. Such an instruction, however, was prejudicial to defendants since it advised the jury that in order to establish the defense of privilege under section 47, subdivision 5, defendants not only had to show that the publication was one that came within the provisions thereof, but also that it was made without malice.

As to whether the trial court should have determined as a matter of law that the subject article was privileged under section 47, subdivision 5, it is apparent that if the trial court had made this determination, in the light of the 1945 amendment to this section, plaintiffs' case would at that moment have been totally and finally resolved against them. However, under the state of the record the trial court could not make this determination as a matter of law. Accordingly, the trial court was justified in leaving to the jury the determination of whether the subject publication came within the purview of subdivision 5 of section 47. The instruction given, however, was not only erroneous because it injected malice as an issue, but also because it purported to instruct the jury that *if the publication was for the public benefit* it was privileged. As we interpret subdivision 5 of section 47 a publication is privileged if it is a fair and true report of the proceedings of a public meeting lawfully convened for a lawful purpose and open to the public, or, alternatively, if it is a fair and true report of the proceedings of a public meeting which is not lawfully convened for a lawful purpose or not open to the public, provided that the publication is for the public benefit.

Under appropriate instructions, therefore, a determination by the jury that the publication was or was not a fair and true report of the proceedings specified in sub-

division 5 of section 47 is dispositive of the issue as to whether the privilege conferred by such provision exists. If the publication is found by the jury to come within the purview of subdivision 5 of section 47 the publication is absolutely privileged, although made maliciously; if it does not so find, the privilege does not exist.

The judgment is reversed.

Sullivan, P. J., and Sims, J., concurred.

A petition for a rehearing was denied September 2, 1965.