[No. G000152. Fourth Dist., Div. Three. Jan. 25, 1985.]

ETHAN A. JENNINGS, JR., Plaintiff and Appellant, v.
TELEGRAM-TRIBUNE COMPANY et al., Defendants and Respondents.

**COUNSEL**

Howard J. Stechel for Plaintiff and Appellant.

Harrison & Watson, Steven B. Davis and Robert Robinson for Defendants and Respondents.

**122**

Opinion

**CROSBY, J.**—The superior court granted the motion for nonsuit of the San Luis Obispo County Telegram-Tribune and various individual defendants in a libel action, and plaintiff Ethan Jennings, Jr., appeals. ██ We find the newspaper's allegedly defamatory descriptions of Jennings' federal tax prosecution sufficiently within the "literary license" of a newspaper reporting official proceedings that the so-called "fair report" privilege of Civil Code section 47, subdivision 4 was established as a matter of law on plaintiff's evidence, and thus affirm.

I

In April 1977 Ethan A. Jennings, Jr., a long-time resident and an established architect in San Luis Obispo, was accused in district court in Los Angeles of failing to file income tax returns for the years 1970 and 1971, when he allegedly received gross income of approximately $180,000 and $256,000. On May 10, 1977, accompanied by present counsel, he pleaded no contest to the misdemeanor offenses of "willfully and knowingly" failing to file income tax returns for those two calendar years (26 U.S.C. § 7203).

The next morning, Pete Dunan, a staff writer for the Telegram-Tribune, heard a radio report and read a brief article in the Los Angeles Times concerning the tax prosecution. He contacted several sources about the plea and its consequences, but was unable to reach Jennings. That afternoon's edition of the Telegram-Tribune ran a page-one news story under his byline, accompanied by the headline, "Prominent SLO architect convicted of tax fraud."

Dunan wrote, "San Luis Obispo architect Ethan A. Jennings Jr. faces a possible sentence of up to two years in prison and a $20,000 fine for his failure to file federal income tax returns during 1970 and 1971. [¶] Jennings pleaded no contest in Los Angeles Federal Court Tuesday to charges he failed to report a total combined income during the two years of more than $436,000." The article explained the legal effect of a no contest plea and reported comments by the prosecuting attorney and an Internal Revenue Service (IRS) spokesman concerning Jennings' possible sentence. It also briefly described Jennings' professional background and concluded his architect's "license [was] valid and not in jeopardy because of his tax difficulties."

On May 17, 1977, the Telegram-Tribune reiterated Jennings "pleaded no contest to income tax evasion charges in federal court last week" and reported he had subsequently been asked to resign as president of Dalessi

Center Inc., a local enterprise formed to develop and construct a highly publicized building project in downtown San Luis Obispo—a project vigorously opposed by the newspaper. The article also observed, "Jennings was convicted on his plea to charges he failed to report an income of more than $436,000 during 1970 and 1971."

This was followed by a third Telegram-Tribune article two days later. There, the paper noted Jennings agreed to resign as president of Dalessi and reported, "[Dalessi] Board Chairman Althea Meissner said the board called for Jennings' resignation after he pleaded no contest in federal court last week to charges of failing to report $436,000 taxable income in 1970 and 1971."

Pursuant to Civil Code section 48a, Jennings' attorney sent a telegram to the editors and publishers of the newspaper on June 4, 1977, labeling certain portions of each article libelous and demanding a retraction. The Tribune declined.

Yet a fourth article appeared in the newspaper on June 2, 1977, after Jennings was sentenced in district court: "Ethan A. Jennings, San Luis Obispo architect, was given a one-year suspended sentence and four years probation by a Los Angeles federal court judge Tuesday for failing to file income tax returns for 1970 and 1971."[1] The article continued, "The maximum possible sentence in Jennings' case is two years in prison and a $20,000 fine for his failure to file income [*sic*] during the two years of more than $436,000."[2] Jennings' demand for retraction of this article was also rejected.

Jennings filed suit two months later in the San Luis Obispo County Superior Court, alleging causes of action for libel, invasion of privacy, intentional infliction of emotional distress, injurious falsehood, interference with contractual relations, interference with prospective economic advantage, and violation of Civil Code section 1708.[3] He claimed the Telegram-Tribune's articles falsely asserted he was convicted "of the specific felonious crimes of tax fraud and tax evasion, involving over $436,000 of taxable income . . ." and alleged the publications were libelous on their face, injured his career, and subjected him to ridicule and scorn. He sought to hold John P. Scripps, the principal shareholder of the Telegram-Tribune Com-

---

[1] Jennings received probation on terms which included two concurrent one-year jail sentences suspended, a twenty-day jail sentence on weekends, and twelve hundred hours of service to a charity.

[2] The complete text of each article appears in the attached appendix.

[3] A motion for change of venue was granted, and the case was transferred to Orange County.

pany, personally liable as the alter ego of the newspaper corporation. In addition to Scripps, Jennings named Pete Dunan, author of the first article; John Marrs, the Telegram-Tribune's managing editor and creator of the headline for the first article; George Brand, editor of the Telegram-Tribune; and Julius Gius, editorial director of the John P. Scripps Newspapers Group, who recommended against publishing retractions of the articles.[4]

The court determined the issue of whether John P. Scripps could be liable as the alter ego of the Telegram-Tribune Company was equitable in nature and would be tried without a jury. The court found he could not be so liable and granted Scripps' oral motion for dismissal.

A jury was then impaneled, and Jennings presented his case in chief. He offered substantial evidence that the publications had destroyed his thriving architecture practice in San Luis Obispo and forced him to move from the area entirely. In order to demonstrate he was not convicted of tax fraud or tax evasion, Jennings called an expert witness, a retired IRS attorney, who testified failure to file a timely tax return is a misdemeanor which contains no element of an intent to defraud or to evade payment of taxes. The offense may be committed by simply omitting to file a return by April 15, even though the taxpayer is in fact entitled to a refund, as Jennings testified he believed he was in the years in question—although he was apparently incorrect about at least one of them.

As to the alleged amount of unreported income, Jennings explained he was a disbursing agent for clients on several construction contracts. While his actual income was modest and appropriate amounts were withheld by his firm which did timely file returns in 1970 and 1971, his gross income was artificially inflated by the contract money which passed through his coffers.

After Jennings rested, defendants moved for nonsuit (Code Civ. Proc., § 581c). For the purpose of the motion, they conceded that Jennings was not a public figure. They noted Jennings' case went only to three phrases in the four articles: the words "tax fraud" in the first, "tax evasion" in the second, and "failing to report $436,000 taxable income" in the third. These words, they claimed, could not be read out of the context of the articles which appeared to give a complete and accurate description of Jennings' tax prosecution. The court agreed and found (1) plaintiff failed to prove the articles "were not a fair and true report of judicial proceedings;" (2) the words "tax fraud" and "tax evasion" were "not a libelous description of

---

[4]Gius was granted summary judgment; Jennings does not appeal from the ensuing dismissal as to him.

the charges of which plaintiff was convicted nor [were] they untrue;" and (3) there was no evidence of malice by any defendant as a matter of law. The court concluded plaintiff failed to produce any evidence to support either a verdict in his favor or an award of damages on any cause of action and granted a nonsuit. Jennings' motion for new trial was denied.

On appeal Jennings claims he established a prima facie case of libel and malice by the defendants and the court erred in excluding certain evidence in his favor and in denying his motion for new trial. He also argues he was entitled to a jury trial on the alter ego issue. His position can be summarized as follows: (1) A report describing a conviction of a crime is libelous per se in this state, and he was never accused or convicted of tax fraud or tax evasion. (2) His *net* income in the two taxable years in question never approached $436,000; consequently, he did not, as the newspaper stated, fail to report $436,000 in taxable income.

## II

California does not hold the press to the precision in reporting that Jennings suggests should prevail, although our Supreme Court specifically adopted the notion of literary license but recently: "The language of *New York Times* [*Co.* v. *Sullivan* (1964) 376 U.S. 254 (11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412)] itself clearly implies that all publications must necessarily be permitted some degree of flexibility in their choice of the proper words and phrases to describe the subject at issue: '[E]rroneous statement is inevitable in free debate, and . . . must be protected if the freedoms of expression are to have the "breathing space" that they "need . . . to survive."' (*New York Times, supra,* 376 U.S. at pp. 271-272 [11 L.Ed.2d at p. 701], citation omitted.) Further, the United States Supreme Court has reaffirmed this concept in several more recent decisions. 'Realistically, . . . some error is inevitable . . . .' (*Herbert* v. *Lando* (1979) 441 U.S. 153, 171-172 [60 L.Ed.2d 115, 131, 99 S.Ct. 1635].)" (*Reader's Digest Assn.* v. *Superior Court* (1984) 37 Cal.3d 244, 261 [208 Cal.Rptr. 137, 690 P.2d 610].)

The Supreme Court explained, "Although California courts have never directly addressed this concept of literary license, there is an appropriate analogy in the 'fair report' privilege. Civil Code section 47, subdivision 4, provides that a privileged publication is one made by a 'fair and true report' of various official proceedings. Several cases have been decided under this statute, and all permit a certain degree of flexibility/literary license in defining 'fair report.'" (*Id.,* at p. 262, fn. 13; see *Grillo* v. *Smith* (1983) 144 Cal.App.3d 868, 873 [193 Cal.Rptr. 414].)

The *Reader's Digest* case considered two statements concerning the plaintiff, Synanon: Plaintiff's "spectacular claims of success were never proved" and "[s]ince 1968, minimal drug rehabilitation work had been attempted; funds, however, were still solicited on that basis." In discussing the first, the Supreme Court stated, "When [the evidence supporting the statements] is considered in the important context of an author's right to choose appropriate words and phrases, Synanon's quibbling over the use of the word 'spectacular' in no way constitutes a legitimate showing of defamation. A fair reading of all the material which was available to Reader's Digest and author MacDonald at the time the article was written clearly suggests that the description of Synanon's success claims as 'spectacular' and 'never proved' falls within an acceptable range of literary license." (*Id.*, at pp. 263-264.) As to the second statement, the court noted, "Given the importance of permitting a reasonable degree of literary license, the statement in question seems easily supportable . . . ." (*Id.*, at p. 265, fn. omitted.)

In *Hayward* v. *Watsonville Register-Pajaronian and Sun* (1968) 265 Cal.App.2d 255 [71 Cal.Rptr. 295], a case factually similar to ours, the court held, " 'It is well settled that a defendant is not required in an action of libel to justify every word of the alleged defamatory matter; it is sufficient if the substance, the gist, the sting of the libelous charge be justified . . . .' " (*Id.*, at p. 262, citing *Kurata* v. *Los Angeles News Pub. Co.* (1935) 4 Cal.App.2d 224 [40 P.2d 520].) In *Hayward* a newspaper reported the plaintiff had formerly been sentenced to prison on a "checks" charge in a different state, when in fact he had been sent to a reformatory as a condition of probation on a forgery charge. The court found the article to have been a " 'fair and true' report of a judicial proceeding within the meaning of Civil Code section 47, subdivision 4, and that it was privileged as a matter of law. There was therefore no triable issue of fact." (*Hayward* v. *Watsonville Register-Pajaronian and Sun, supra,* 265 Cal.App.2d at p. 262.)

*Handelsman* v. *San Francisco Chronicle* (1970) 11 Cal.App.3d 381 [90 Cal.Rptr. 188] is also similar. There, a newspaper characterized a complaint for civil conversion as an allegation of "outright theft." In affirming a jury's verdict that the description was a fair and true report of the complaint, the court commented, "The report is not to be judged by the standard of accuracy that would be adopted if it were the report of a professional law reporter or a trained lawyer." (*Id.*, at p. 387, citing *Spradlin's Market, Inc.* v. *Springfield Newspapers, Inc.* (Mo. 1966) 398 S.W.2d 859, 866.)

In *Kilgore* v. *Younger* (1982) 30 Cal.3d 770 [180 Cal.Rptr. 657, 640 P.2d 793], the Attorney General of California released a report containing the names of a number of persons suspected of involvement in organized crime and a variety of criminal conduct. Kilgore, who was listed as a book-

maker, brought suit against several newspapers who simply reported the inclusion of his name without identifying the criminal activity he was suspected of. He argued the articles were not fair and true because, in failing to state he was suspected only of bookmaking, they implied he was engaged in *all* the criminal activity described in the report, including, for example, racketeering, narcotics, pornography, murder, and so on. The court had little difficulty with the contention: "Kilgore's attempt to read the reports' delineation of organized criminal activity as pertaining in all respects to himself is unwarranted. In our view, the average reader of either paper would reasonably interpret the articles to imply only that Kilgore was connected in some fashion with organized crime. As we see it, this is exactly the import of Attorney General Younger's release. In other words, we simply do not believe that the average reader would take the articles to intimate that Kilgore was involved in every—or even necessarily more than one—type of organized criminal activity. We hold, therefore, that the papers captured the substance of Attorney [General] Younger's release, and thus that the requirement of section 47, subdivision 5, to wit: that the reports be fair and true, was satisfied as a matter of law." (*Id.*, at p. 777.)

 The same is true here. The gist or sting of the articles is that Jennings was convicted on his no contest plea to several serious tax crimes. In view of the sentence imposed, the offenses certainly fit that description. The facts of the crimes were accurately described in the articles, as were the court proceedings and judgment. "Tax fraud" and "tax evasion" are harsh terms; but we cannot say the average reader would have viewed the offenses differently, given the amount of gross income involved and the length of time it had gone unreported, had less colorful descriptions been chosen. (*Glenn* v. *Gibson* (1946) 75 Cal.App.2d 649 [171 P.2d 118].) In short, while perhaps overblown or exaggerated, the terms are easily within the literary license concept of the *Reader's Digest* case. (See also *Rollenhagen* v. *City of Orange* (1981) 116 Cal.App.3d 414, 427-429 [172 Cal.Rptr. 49].)

 Nor can we fault the newspaper's description of the *amount* of the unreported taxable income: "A publication is not responsible for every strained interpretation a plaintiff might put on its words. (*Forsher* v. *Bugliosi* (1980) 26 Cal.3d 792, 803 [163 Cal.Rptr. 628, 608 P.2d 716].)" (*Grillo* v. *Smith, supra,* 144 Cal.App.3d at p. 874.) An accountant might agree with Jennings that only net income is technically taxable, but he would also be forced to admit that the gross income must be reported. Also, *that* income *is* technically taxable; the taxpayer must claim acceptable deductions or exemptions in order to reduce it. An average reader would undoubtedly have understood the figure involved was a gross figure; for, read literally, the stories more easily lend themselves to that conclusion than the one pro-

posed by Jennings. To engage in the sort of semantics his argument involves would be to reject aborning the newly recognized concept of literary license, the latest expression of our Supreme Court in a defamation case—not an appropriate role for a lower court.

Since the report is privileged as a matter of law, we have no reason to reach the question of malice and alleged errors in rejecting certain of Jennings' evidence on the subject. (*Williams* v. *Daily Review, Inc.* (1965) 236 Cal.App.2d 405, 418 [46 Cal.Rptr. 135].) ■ "[A] fair and true report of a known falsehood concerning a private citizen uttered in a judicial proceeding is not actionable"—without regard to malice. (*Grillo* v. *Smith, supra,* 144 Cal.App.3d at p. 873; *Weingarten* v. *Block* (1980) 102 Cal.App.3d 129, 148 [162 Cal.Rptr. 701].)

## III

*Handelsman* v. *San Francisco Chronicle, supra,* 11 Cal.App.3d 381 does support Jennings on one point which requires comment. The court states, "Plaintiff argues that the trial court erred in letting the jury decide whether the newspaper article containing the term 'theft' was a fair and true report of the substance of the complaint for civil conversion. Plaintiff claims that this question was one of law for the court and, on the facts in this case, should have been determined adversely to the newspaper. ■ The applicable law in California is that whether or not *a privileged occasion exists is for the court* to decide, while the effect produced by the particular words used in an article and *the fairness of the report* is a question of fact *for the jury* (*Williams* v. *Daily Review, Inc., supra,* 236 Cal.App.2d 405, 418-419 [46 Cal.Rptr. 135]). This was the procedure followed in the instant case. The authorities cited by plaintiff concern situations where the matter was solely one of law because of the procedural posture of the case (e.g., summary judgment or a demurrer) and they have no relevance here." (*Id.,* at p. 386.)

In both *Handelsman* and *Williams, plaintiffs* sought directed verdicts on the fair and true report issue, which were properly denied on the merits. Here, the *defendants* made the motions, and they were properly granted on the merits. Apart from these distinctions, we do not believe the "procedural posture" of a case is meaningfully different simply because the court considers the legal question of whether there is a viable issue of fact to submit to a jury during trial, rather than before. Also, it is illogical to suggest the court has less power to make a determination on the fairness of a report at the close of plaintiff's case than when it reviews the same question on demurrer or summary judgment. Because of the different legal standards

applicable at the various stages of the proceedings, the opposite rule would be closer to the truth.

Moreover, to illustrate the absurd fruit which the *Handelsman* dictum is capable of yielding, we note these defendants did seek pretrial review of the fair and true report question on motion—and prevailed, only to have the victory quashed on rehearing before a different judge. Which of the three or more decisions on the issue made at different stages of the proceedings in the superior court should we review? Or, put another way, if the law and motion court erroneously refuses to dispatch a case where the alleged defamation is a privileged fair report of a judicial proceeding as a matter of law, is the trial judge then condemned to repeat the mistake by allowing the case to go to the jury? Clearly not.

■ The unwavering direction of the cases is to dispose of defamation actions at the earliest possible stage of the proceedings where the facts as alleged are insufficient as a matter of law to support a judgment for the plaintiff. *Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d 244, 251 was decided on summary judgment. *Kilgore* v. *Younger, supra,* 30 Cal.3d 770, 783 was decided on demurrer. This case could have been decided at those stages. (See also *Okun* v. *Superior Court* (1981) 29 Cal.3d 442, 460 [175 Cal.Rptr. 157, 629 P.2d 1369].) But this cannot mean the defendants' motion on the cause of action for libel was erroneously granted. A lawsuit, unlike a cartoon snowball rolling downhill, does not build up size and momentum by mere dint of survival in the superior court.

■ Finally, the other causes of action, invasion of privacy, intentional infliction of emotional distress, interference with contractual relations, and so on, must fall with the libel count: "The *New York Times* decision defined a zone of constitutional protection within which one could publish . . . without fear of liability. That constitutional protection does not depend on the label given the stated cause of action . . . ." (*Reader's Digest Assn.* v. *Superior Court, supra,* 37 Cal.3d at p. 265.)

Judgment affirmed. Respondents are entitled to costs on appeal.

Trotter, P. J., and Sonenshine, J., concurred.

A petition for a rehearing was denied February 21, 1985, and appellant's petition for a hearing by the Supreme Court was denied April 3, 1985.

# APPENDIX

May 11, 1977

# Prominent SLO architect convicted of tax fraud

By Pete Dunan
Staff Writer

San Luis Obispo architect Ethan A. Jennings Jr. faces a possible sentence of up to two years in prison and a $20,000 fine for his failure to file federal income tax returns during 1970 and 1971.

Jennings pleaded no contest in Los Angeles Federal Court Tuesday to charges he failed to report a total combined income during the two years of more than $435,000.

( * no contest, or "nolo contendre," is a plea that without admitting guilt subjects the defendant to conviction but does not preclude him from denying the truth of the charges in any other legal proceedings. )

Jennings supervised numerous federally insured multi-family housing projects built in San Luis Obispo during the same two-year period.

Jennings is President of the Daleasi Center Inc., a group that recently gave up plans to build a multi-story office building on the site of the old Obispo Theater at Monterey and Osos streets. He is also senior partner in the firm of Jennings, Vaicius & Associates in San Luis Obispo. He was the architect responsible for the extensive remodeling of San Lu's Obispo City Hall.

Sentencing was set for May 31. Jennings entered his pleas before U.S. District Judge Manual L. Real.

Assistant U.S. Attorney Jon Rapore said there is a maximum fine of $10,000 for each count and Jennings could be sent to prison for up to a year on each charge, or a combination of both.

An Internal Revenue Service spokesman, familiar with the case, said the probability of Jennings going to prison on these two charges is slim. However, he said a stiff fine, plus all the back taxes and penalities is likely.

The spokesman said Jennings is the subject of an ongoing investigation and more charges "could possibly be filed in the future."

Jennings is a member of the American Institute of Architects and is licensed by the state.

A Department of Consumer Affairs spokeswoman said today Jennings' license is vel'.. and not in jeopardy because of his tax difficulties.

May 17, 1977

# Dalessi Center directors ask president to resign

San Luis Obispo architect Ethan Jennings Jr., who pleaded no contest to income tax evasion charges in federal court last week, has been asked to resign as president of Dalessi Center Inc.

A statement issued by the company's board of directors said Jennings' resignation was sought "due to the impugnment of its reputation" by his actions and publicity concerning them.

Dalessi Center Chairman Althea Meissner said this referred specifically to the income tax case. "Dalessi Center has always tried to do the best for the community and the board felt at this time that this would be the best move," she said.

The company seeks to build an office building at Monterey and Osos streets in downtown San Luis Obispo.

The city Architectural Review Commission recently rejected plans for a six-story, mirror-walled design and the City Council affirmed the commission action.

Jennings was convicted on his plea to charges he failed to report an income of more than $435,000 during 1970 and 1971. He is scheduled to be sentenced in Los Angeles Federal Court on May 31.

May 19, 1977

# Dalessi president agrees to resign

San Luis Obispo architect Ethan Jennings said Wednesday he will resign as president of Dalessi Center Inc. as requested last weekend by the company's board of directors.

Board Chairman Althea Meissner said the board called for Jennings' resignation after he pleaded no contest in federal court last week to charges of failing to report $435,000 taxable income in 1970 and 1971.

Jennings said he owns no stock in Dalessi, which has proposed to build an office building on the site of the old Obispo Theatre at Monterey and Osos streets. But he said he will maintain a business relationship with the company through a contract between it and his architectural firm, Jennings, Valcius and Associates.

He said he wouldn't comment on the income tax case until after his sentencing, set for May 31.

June 2, 1977

# Suspended sentence

## SLO architect gets 4 years probation

Ethan Jennings, San Luis Obispo architect, was given a one-year suspended sentence and four years probation by a Los Angeles federal court judge Tuesday for failing to file income tax returns for 1970 and 1971.

U.S. District Court Judge Manuel L. Real, as a condition of the suspended sentence, ordered Jennings to spend 20 days in jail on consecutive weekends starting in June.

As a condition of probation, the judge also ordered Jennings to donate 1,200 hours or 150 days of work during four years to charitable activities approved by his probation officer.

The maximum possible sentence in Jennings' case is two years in prison and a $20,000 fine for his failure to file income during the two years of more than $436,000.

Jennings pleaded no contest to the charges on May 18.

Jennings is senior partner in the firm Jennings, Vaichus and Associates in San Luis Obispo and was the supervising architect for the extensive remodeling of San Luis Obispo City Hall.

An Internal Revenue Service spokesman said Jennings is the subject of a continuing investigation and more charges are possible.