Richard P. CRANE, Jr. and James D. Henderson, Plaintiffs,

v.

ARIZONA REPUBLIC, Jack Anderson, Jerry Vann, aka Jerry Van Hoorelbeke, Jerry Seper, Darrow Tully, Alan Moyer, Phoenix Newspapers, Inc., and Does 1 Through 50, inclusive, Defendants.

No. CV 88–4762–ER.

United States District Court, C.D. California.

Dec. 28, 1989.

James B. Kropff, Girardi, Keese & Crane, Los Angeles, Cal., for plaintiffs.

Paul F. Eckstein, Daniel C. Barr, Brown & Bain, Phoenix, Ariz., Robert C. Vanderet, Beth K. Baier, O'Melveny & Myers, Los Angeles, Cal., for defendants.

## MEMORANDUM OPINION AND ORDER

RAFEEDIE, District Judge.

This case involves an article published in *The Arizona Republic* on August 1, 1984, entitled "U.S. Crime Strike Force in L.A. Accused of Corruption," written by reporter Jerry Seper ("the article"). The article is reprinted as an Appendix to this opinion. Plaintiffs filed suit against defendant publishers of the article for libel, slander and intentional infliction of emotional distress. Defendants moved for summary judgment. Defendants' motion is granted.

## BACKGROUND

Plaintiffs Richard P. Crane, Jr., and James D. Henderson are lawyers who, at the time the article was published, were respectively the former and present heads of the United States Justice Department's Los Angeles Organized Crime and Racketeering Strike Force ("the Strike Force"). The Strike Force coordinates federal, state and local law enforcement agency efforts in cases against organized crime and racketeering figures and prosecutes such cases.

In the Spring of 1983, the House of Representatives' Select Committee on Narcotics Abuse and Control ("the House Select Committee") received allegations of corruption by the current and former heads of the Strike Force. Those allegations were made by Gerald Van Hoorelbeke, aka Jerry Vann ("Vann"), who at the time was serving a sixteen year sentence for extortion, assault with a deadly weapon on a police officer and conspiracy. The Strike Force had used Vann as a witness in earlier investigations and prosecutions. Vann was placed in the Witness Security Program in May, 1980, at the request of Strike Force Chief Henderson.

Vann alleged to the House Select Committee that plaintiffs have ties to organized crime and, as a result, a number of meritorious criminal cases were dismissed by Strike Force attorneys. He alleged that Henderson was a subordinate of Crane's while Crane was Strike Force Chief, and that the two had formed a personal friendship. Vann alleged that Crane's clients were organized crime figures, and that Crane used his friendship with Henderson to put a halt to investigations of his clients by the Strike Force.

Specifically, Vann alleged that several strong cases were made against an alleged Hawaiian organized crime chief during investigative operations "Fireball" and "CoCo." This individual had allegedly been arrested on a number of occasions for narcotics and income tax violations in concert with entertainers and organized crime figures. These cases, Vann alleged, were never brought to trial as a result of the efforts of plaintiffs and others. Vann also alleged that two extortion cases against another alleged organized crime boss were dismissed by the U.S. Attorney's office at the urging of organized crime.

After receiving Vann's allegations, Congressman Charles Rangel, Chairman of the House Select Committee, and Congressman Benjamin Gilman asked Sterling Johnson, Jr., the Special Narcotics Prosecutor for the City of New York, to conduct a preliminary investigation to determine whether Vann's allegations were credible and should be investigated further. On September 6, 1983, Johnson submitted a report to John T. Cusack, Chief of Staff of the House Select Committee ("the Johnson Report"). After reading the report, Johnson, Cusack and Chairman Rangel agreed that the allegations were credible and merited a full investigation. On November 15, 1983, Chairman Rangel wrote United States Attorney General William French Smith and "strongly urge[d]" that Smith "undertake a vigorous investigation" of Vann's allegations ("the Rangel Letter"). The Committee suggested twelve persons who the Department of Justice ("DOJ") might interview.

The DOJ investigation commenced on November 28, 1983. The DOJ interviewed the twelve persons noted by the House Select Committee as well as others in the course of its investigation.

On January 5, 1984, as part of the House Select Committee's continuing investigation into Vann's allegations, Richard Lowe III, Chief Counsel for the House Select Committee, and John Capers, a Staff Investigator for the House Select Committee, interviewed Donald Carstensen, Investigator for the Organized Crime Strike Force, Department of the Prosecuting Attorney, City of Honolulu. The result of this interview was the "Lowe Report" submitted to the House Select Committee which indicated that "Carstensen substantiated the allegations of Vann."

On June 5, 1984, reporter Jerry Seper was contacted by inmate Vann. Vann informed Seper of Vann's allegations against plaintiffs, and forwarded copies of the Johnson Report, a letter from the DOJ dated November 28, 1983 confirming that the DOJ was undertaking an investigation of the allegations ("the Shaheen Letter"), and an undated House Select Committee case report authored by investigator Capers ("the Capers Report"). Seper received copies of the Rangel Letter and Lowe Report from a confidential source at the House Select Committee. Seper verified the authenticity of these reports by contacting John Cusack at the House Select Committee.

Seper contacted plaintiff James D. Henderson on June 10, 1984. Henderson denied the allegations made by Vann, and denied having knowledge of the House Select Committee investigation. Henderson stated that Vann had a personal vendetta against him. On July, 27, 1984, Seper contacted plaintiff Richard P. Crane, Jr. who also denied the allegations, and stated that he and Henderson had discussed the allegations. He also stated that Vann was a "kook."

Seper's article was published by *The Arizona Republic* on August 1, 1984. The article relies in part upon allegations and statements made in the various House Se-

lect Committee documents and on the statements made by the plaintiffs and persons working on the House Select Committee investigation.

On April 5, 1985, the DOJ issued a report to the House Select Committee stating that "based upon our investigation, we have concluded that the allegations raised in [the Rangel Letter] ... are unfounded."

Plaintiffs filed this suit in state court in July 1985. In April 1987, defendants moved for summary judgment. The state judge denied that motion. This case was removed to federal court on August 5, 1988. For the second time in this litigation, defendants have moved for summary judgment or summary adjudication of issues against plaintiffs' complaint which alleges libel, slander and intentional infliction of emotional distress.

## DISCUSSION

 A federal court may, in its discretion, grant summary judgment after removal notwithstanding an earlier denial of the same motion by a state judge, if there are "cogent" reasons for doing so. *Preaseau v. Prudential Insurance Company of America*, 591 F.2d 74, 79–80 (9th Cir.1979). There are cogent reasons for hearing this Motion. First, because there is a concern that unfounded libel suits may chill free speech, there is a strong federal policy of disposing of libel cases by motion rather than trial where possible. *See e.g. Gintert v. Howard Publications Inc.*, 565 F.Supp. 829, 831 (N.D.Ind.1983) (summary judgment is "peculiarly appropriate in libel cases ... where considerations of constitutional freedoms arise"). Second, since the state court made its decision on the earlier summary judgment motion, the law pertaining to libel has changed. In *Masson v. New Yorker Magazine Inc.*, 881 F.2d 1452 (9th Cir.1989), the Ninth Circuit adopted the "incremental harm" doctrine. Under this doctrine, publication of a non-privileged defamatory statement is not actionable if no incremental harm is suffered as a result of that publication in light of the harm caused by the privileged publication of otherwise defamatory statements.

Therefore, there are cogent reasons why this court should here this motion.

Defendants ground their motion for summary judgment in three First Amendment immunity doctrines.

First, defendant claims that the article is immune under the California Civil Code section 47(4) which renders absolutely immune "fair and true" reports of a "public proceeding" by a public journal. Defendants further argue that any defamatory statements in the article not covered by this doctrine are non-actionable under the newly adopted "incremental harm" doctrine. Plaintiffs assert that the House Select Committee investigation was not a public proceeding; that there is a genuine dispute of material fact as to whether defendant's report was "fair and true", and arguendo that the article was not "fair and true" as a matter of law.

Second, defendants argue that plaintiffs are public figures, and that plaintiffs have failed to allege sufficient facts from which a jury could determine by clear and convincing evidence that the defendants acted with actual malice. Further, defendants argue that any defamatory statements for which plaintiffs have shown malice are non-actionable under the "incremental harm" doctrine. Plaintiffs argue that they are not public figures, and arguendo, that plaintiffs have sufficiently demonstrated malice.

Third, defendants argue that the article is immune under the "neutral reportage" doctrine adopted in other jurisdictions. Plaintiffs argue that this doctrine is not good law, and that the article does not satisfy its criteria.

Rule 56 of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when the evidence indicates that there is "[1] no genuine dispute as to any material fact and [2] that the moving party is entitled to judgment as a matter of law." *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The court must view the evidence in the light most favorable to the nonmoving party. *TW Electrical Services v. Pacific Elec-*

*trical Contractors*, 809 F.2d 626, 630 (9th Cir.1987). "[I]f a rational trier of fact might resolve the issue in favor of the nonmoving party, summary judgment must be denied." *Id.* at 631.

■ While the burden is on the moving party to demonstrate that summary judgment is appropriate, *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970), the nonmoving party "cannot rest on the allegations contained in his complaint in opposition to a properly supported summary judgment motion." *First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569, *rehearing denied*, 393 U.S. 901, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968). Rather, the nonmoving party must produce "significant probative evidence" indicating that a dispute of material fact exists. *S.E.C. v. Murphy*, 626 F.2d 633, 640 (9th Cir.1980). A nonmoving party does not meet this burden by merely asserting, by affidavit or otherwise, that a genuine issue exists for trial. *Palila v. Hawaii Dept. of Land & Natural Resources*, 639 F.2d 495, 497 (9th Cir.1981); Wright and Miller, Federal Practice and Procedure § 2727.

There are no genuine disputes of material fact which would render summary judgment inappropriate in this case. In all, the parties submitted twenty six pages of argument regarding the existence or non-existence of genuine disputes of material fact. This is largely the result of defendant's Statement of Uncontroverted Facts which contains extraneous characterizations and assertions about the facts of this case which are not material to defendant's various grounds for summary judgment—*ie.* whether the author of the allegedly defamatory article is "award winning." Plaintiffs responded by contesting

virtually all of these extraneous assertions. Thus, the bulk of these briefs go to immaterial matters.

Most of the remaining disputes go to questions of law. Plaintiffs argue that there is a dispute of material fact concerning whether Seper's article is a "fair and true" report for the purposes of section 47(4) immunity. However, whether a report meets the "fair and true" standard is a matter of law, not fact, which is properly determined by the court where there is no dispute about the content of the official documents or proceedings upon which the report is based. *Jennings v. Telegram–Tribune Co.*, 164 Cal.App.3d 119, 128–29, 210 Cal.Rptr. 485, 489–90 (1985); *Reeves v. American Broadcasting Companies, Inc.*, 719 F.2d 602, 607 (2d Cir.1983); *Murray v. Bailey*, 613 F.Supp. 1276, 1284 (N.D.Cal. 1985).[1] Neither party disputes the contents of the documents received by defendant, nor the contents of the article.

Plaintiffs attempt to argue that there is a genuine dispute as to whether the House Select Committee on Narcotics Abuse and Control ever conducted an investigation of plaintiffs. However defendants have submitted substantial evidence indicating that such an investigation occurred, including the declarations of House Select Committee members confirming that such an investigation occurred, and the documents generated by the House Select Committee which explicitly state that an investigation occurred. Plaintiffs have not brought forth evidence to rebut defendants' properly supported assertion of fact.

Parties dispute whether Seper acted with malice in publishing this article. While this is a question of fact, this dispute does not frustrate summary adjudication for two reasons. First, in order to survive a mo-

---

**1.** The plaintiffs rely upon *Handelsman v. San Fransisco Chronicle*, 11 Cal.App.3d 381, 90 Cal. Rptr. 188 (1970), to assert the contrary. This reliance is misplaced. That case merely held that the issue of whether a report is "fair and true" may go the jury *after* trial of the case. *Id.* at 386, 90 Cal.Rptr. 188. The court recognized, however, that this was a question of law on a motion for summary judgment, indicating that the "procedural posture" of the case determined the proper standard. *Id.* This questionable distinction has been criticized and/or ignored by subsequent cases. *See e.g., Jennings*, 164 Cal. App.3d at 128–29, 210 Cal.Rptr. 485 (choosing not to follow *Handelsman* and illustrating "the absurd fruit which the *Handelsman* dictum is capable of yielding"); *but see, Green v. Cortez*, 151 Cal.App.3d 1068, 1073, 199 Cal.Rptr. 221, 224 (1984) (dictum stating that fair and true is a question of fact and citing *Handelsman* ).

tion for summary judgment in a defamation case involving a public figure, a plaintiff must provide evidence of sufficient "caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Thus a genuine dispute alone will not frustrate summary adjudication unless plaintiff meets its evidentiary burden. Second, and more importantly, the issue of malice is a non-issue for the purpose of applying California Civil Code section 47(4), the primary basis upon which summary judgment will be granted by the Court.

Thus, there are no genuine disputes of material fact which would render summary adjudication of this matter inappropriate. Summary judgment will be granted if either party is entitled to judgment as a matter of law.

## I. California Civil Code 47(4) Immunity

Under California Civil Code section 47(4) an article is privileged if it (1) appears "in a public journal"; (2) is a "fair and true report"; (3) of a "judicial, legislative or other public official proceeding" or "anything said in the course thereof." [2]

Plaintiffs object to summary judgment based upon application of this doctrine on three grounds: (A) the report does not report an "official public proceeding"; (B) the article is not a "fair and true" report, and; (C) certain statements in the article were not derived from the investigative materials and therefore are not immune. [3]

### A. *The Article Reports on an Official Public Proceeding*

■ The article reported on a secret investigation by the House Select Committee on Narcotics Abuse and Control. To determine whether this investigation constitutes an "official public proceeding" for the purpose of section 47(4), the Court must exam-

ine the privilege's purpose. The privilege is rooted in the press' "watchdog" function over the government. Thus, in commenting on the section 47(4) privilege, one California court noted

> In our society the power resides with the people; public supervision of governmental administration is the cornerstone of democracy.... While the public may not have an overriding interest in knowing the details of every crime committed, its interest in overseeing the conduct of the prosecutor, the police, and the judiciary is strong indeed.

*McClatchy Newspapers, Inc. v. Superior Court,* 189 Cal.App.3d 961, 975, 234 Cal. Rptr. 702, 710 (1987). The parallel to an investigation by the House Select Committee on Narcotics Abuse and Control into alleged wrongdoing by the then present and a former head of the United States Justice Department's Los Angeles Organized Crime Strike Force is clear. Investigations by other bodies have been held to be "official public proceedings." *See e.g., Howard v. Oakland Tribune,* 199 Cal. App.3d 1124, 245 Cal.Rptr. 449 (1988) (report of investigation by state administrative agency privileged); *Cf., Green v. Cortez,* 151 Cal.App.3d 1068, 1073, 199 Cal. Rptr. 221, 224 (1984) (stating in dicta a police investigation is "no doubt" a public official proceeding within the meaning of 47(4)).

The fact that the investigation was secretive does not preclude the House Select Committee's activities from being an "official public proceeding." "California caselaw unambiguously indicates a concern for unfettered accurate press coverage even of secret proceedings." *Reeves,* 719 F.2d at 605–06 (applying California law and holding that secret grand jury proceedings are privileged under section 47(2) and noting that the same result would be reached under section 47(4)); *see also, Tiedemann v. Superior Court,* 83 Cal.App.3d 918, 148 Cal.

---

**2.** This section provides in pertinent part:
 A privileged publication or broadcast is one made—
 4. By a fair and true report in a public journal, of (1) a judicial (2) legislative, or (3)

other public official proceeding, or (4) of anything said in the course thereof....

**3.** Parties do not dispute that *The Republic* newspaper is a "public journal."

Rptr. 242 (1978) (statements made in connection with secret IRS investigation privileged when intended to spark a quasi-judicial proceeding). These courts have held that the secret reports of judicial proceedings may be privileged.[4] The "watchdog" function of this privilege would warrant no differentiation between a judicial and legislative investigations. Indeed it would favor application of the privilege to the elected branches of the government.

Therefore, the investigation by the House Select House Select Committee on Narcotics Abuse and Control was an "official public proceeding" within the meaning of 47(4).

**B.** *The Report Was a "Fair and True" Report*

■ Section 47(4) "does not require the reporter to resolve the merits of the charges, nor does it require that he present the [plaintiff's] version of the facts." *Reeves,* 719 F.2d at 606–07; *see also, Rollenhagen v. City of Orange,* 116 Cal. App.3d 414, 427, 172 Cal.Rptr. 49, 57 (1981). Rather, a "fair and true" report "is one which 'captures the substance' of the proceeding 'measured by the nature and probable effect on the mind of the average reader.'" *Murray v. Bailey,* 613 F.Supp. 1276, 1284 (N.D.Cal.1985) (*quoting, Kilgore v. Younger,* 30 Cal.3d 770, 777, 180 Cal.Rptr 657, 661, 640 P.2d 793, 797 (1982)). The "cases ... all permit a certain degree of flexibility [or] literary license in defining 'fair report.'" *Reader's Digest Ass'n v. Superior Court,* 37 Cal.3d 244, 262 n. 13, 208 Cal.Rptr. 137, 148 n. 13, 690 P.2d 610 (1984), *cert. denied,* 478 U.S. 1009, 106 S.Ct. 3307, 92 L.Ed.2d 720 (1986). To invoke the protections of section 47(4)

> a defendant is not required ... to justify every word of the alleged defamatory matter; it is sufficient if the substance [or] gist [or] sting of the libelous charge be justified and if the gist of the charge

be established by the evidence, the defendant has made his case.... If the substantial imputations be proved true, a slight inaccuracy in the details will not prevent a judgment for the defendant, if the inaccuracy does not change the complexion of the affair so as to affect the reader of the article differently than the actual truth would.

*Hayward v. Watsonville Register,* 265 Cal. App.2d 255, 262, 71 Cal.Rptr. 295, 300 (1968) (*quoting, Kurata v. Los Angeles News Pub. Co.,* 4 Cal.App.2d 224, 227–28, 40 P.2d 520, 522).

The plaintiffs submit four reasons why the report was not "fair and true." They claim that (1) the paragraph 7 statement that "Henderson and Crane were unusually soft on organized crime and corruption" is not supported by the House Select Committee documents; (2) the paragraph 9 statement that "Vann described crime figures including high-profile drug dealers and members of the Israeli Mafia as friends and associates of the two prosecutors" is not supported by the House Select Committee documents; (3) the paragraph 33 statements that a "confidential memo" substantiated many of Vann's allegations and relied upon a law enforcement official "described as being knowledgeable about the Los Angeles based Strike Force" are not supported by the House Select Committee documents; and (4) failure to report other facts which would impugn Vann's credibility which were known to the House Select Committee.

(1) paragraph 7

Paragraph 7 reads "Vann told the House Select Committee that Henderson and Crane were unusually soft on organized crime and corruption." The Johnson Report merely states, however that "Henderson, in addition to being a personal friend of Crane's, was portrayed as being unusually soft on organized crime and corruption." No explicit statement is made

---

**4.** Of note is *Medico v. Time Inc.,* 509 F.Supp. 268 (E.D.Pa.1980), *affirmed,* 643 F.2d 134 (3d Cir.), *cert. denied,* 454 U.S. 836, 102 S.Ct. 139, 70 L.Ed.2d 116 (1981), where the court applied section 611 of the Restatement (Second) of Torts which is virtually identical to California Civil Code section 47(4). There, the court concluded that a secret F.B.I. report which had leaked to the press constituted a report of "an official proceeding or public meeting" as required under the Restatement section 611 privilege.

that *Crane* is "unusually soft on organized crime."

Nevertheless, the article's statement captures the "gist" of the House Select Committee documents. The paragraph in the Johnson Report which precedes the above quoted paragraph states:

Crane, supervisor of the Strike Force in Los Angeles for 13 years, resigned his position and went into private practice in Las Vegas. He is the attorney for the Aladdin Hotel Casino in Las Vegas and personally owns "points" in the Barbary Coast Casino. *Crane's clients are organized crime figures.* When Crane's client's have problems with the Los Angeles Strike Force, they are rarely touched because the current chief (Jim Henderson) is a friend and former subordinate of Crane's. (Emphasis added).

Further, the Rangel Letter states that Vann's allegations to the House Select Committee "of official corruption and dereliction of duty" were "directed specifically against the Los Angeles Strike Force, its former chief, Richard Crane, and its current leader, Jim Henderson." Given these additional statements in the House Select Committee documents, the article's statement "that Henderson and Crane were unusually soft on organized crime and corruption" certainly "captures the substance" of the House Select Committee documents. *Murray*, 613 F.Supp. at 1284 (*quoting, Kilgore v. Younger*, 30 Cal.3d 770, 777, 180 Cal.Rptr 657, 661, 640 P.2d 793, 797 (1982)). Therefore, paragraph 7 is a "fair and true" report of the House Select Committee proceedings.

### (2) paragraph 9

Paragraph 9 reads

Vann described the crime figures, including high profile dealers and members of the Israeli Mafia, as 'friends and associates' of the two prosecutors. He said Crane, who retired in 1977 after 13 years as head of the Strike Force, currently works for 'the Las Vegas Mob' and is involved in gambling interests in Nevada.

Though the quotes above do not appear in the House Select Committee documents, they are nevertheless a "fair and true" representation of the House Select Committee documents obtained by Seper. The statements relied upon in finding that paragraph 7 is true and fair are equally applicable here. The House Select Committee documents obtained by Seper also contain a discussion of Vann's personal ties with a group which "specialized in arson, narcotics, pornography and corruption." Vann made a specific allegation that the Strike Force suppressed the prosecution of this group despite the fact that DEA agents had "hand to hand" buys from this group. Further, the Capers Report states that Vann

alleged that past and present officials assigned to the Los Angeles Crime Strike Force have ties to organized crime in their region. As a result of these ties, Vann claimed that a number of criminal cases with merit were dismissed by the Strike Force prosecutors.

Seper is permitted to take some literary license in reporting the contents of the documents. In light of this standard, the article captures the substance of Vann's allegations made to the House Select Committee as reflected in the House Select Committee documents.

### (3) paragraph 33

Paragraph 33 reads:

A confidential memo dated Jan. 30 said many of Vann's allegations had been 'substantiated' during the House Select Committee's secret inquiry. The memo, a copy of which has been obtained by *The Republic,* outlined an interview with a law-enforcement official in Hawaii, who was described as being knowledgeable about the activities of the Los Angeles-based Strike Force.

The confidential memo mentioned is the Lowe Report. The law enforcement official is Donald Carstensen, an investigator for the Strike Force of the Department of the Prosecuting Attorney for the City and County of Honolulu. The Lowe Report states that "Officer Carstensen substantiated the allegations of Jerry Vann, an inmate incarcerated in the Federal Government Witness Protection Plan. Mr. Vann

was previously interviewed by Sterling Johnson, Special Counsel, House Select Committee on Narcotics Abuse and Control [the result of which was the Johnson Report]." Plaintiff contends that the statement that Carstensen was "knowledgeable" about the Strike Force is not a fair and true report of the House Select Committee documents. However, the Lowe Report explicitly states that Carstensen substantiated Vann's statement in the Johnson Report. Vann's statements in the Johnson Report require knowledge about the Strike Force. Therefore, the "substance" of the House Select Committee documents is that Carstensen had knowledge of and was knowledgeable about the Strike Force.

Even if this were not a fair and true characterization of the House Select Committee reports and documents, the statements defamatory effect is marginal. The newly adopted "incremental harm" doctrine would make this statement unactionable. This doctrine is discussed *infra.*

### (4) Information in the Reports Left Out of the Article

Finally, plaintiffs argue that the article is not fair and true because Seper left out certain allegations by Vann made to the House Select Committee which would impugn Vann's credibility.[5] Failure to include these wild allegations, plaintiffs argue, renders the article an unfair and untrue article which does not capture the substance of the House Select Committee's reports.

It does not. First, the central issue is whether the article reflects the proceedings of the *House Select Committee*, not whether the article is fair to the plaintiffs. In essence, the plaintiffs are arguing that the House Select Committee should not have believed Vann and did not act fairly toward plaintiffs. However, section 47(4) "does not require the reporter to resolve the merits of the charges, nor does it require that he present the [plaintiff's] version of the facts." *Reeves,* 719 F.2d at 606-07; *Rol-*

*lenhagen,* 116 Cal.App.3d at 427, 172 Cal. Rptr. 49. The article need only fairly and truly reflect the House Select Committee's proceedings.

The House Select Committee was fully aware of these wild accusations but clearly felt that Vann's testimony was credible. As result of Vann's allegations, the House Select Committee instigated its own investigation and wrote a letter to then Attorney General William French Smith in which House Select Committee Chairman Rangel said I "strongly urge you to undertake a vigorous investigation." Therefore, the article is a fair and true report of the House Select Committee proceedings despite the fact that Seper omitted certain allegations made by Vann to the House Select Committee.

Second, the article contained a significant amount of material which naturally tended to impugn Vann's credibility such as the fact that he was a convict serving a 16 year sentence for, among other things, extortion and the fact that Vann was a member of an organized crime group. Further, the article notes that Crane and Henderson denied Vann's allegations and quoted Henderson as stating that Vann had a "personal vendetta" against him and that Vann "is not a credible witness." The article also quotes Henderson as saying "If the House Select Committee is listening to Jerry Vann, they ought to consider whether or not he is a credible witness.... He is not." The omission of certain allegations made by Vann to the House Select Committee does not render this article unfair or untrue.

Thus the Court concludes that the article is a "fair and true" report of the House Select Committee's proceedings. As noted above, "a media defendant does not have to justify every word of the alleged defamatory material that is published. The media's responsibility lies in ensuring that the 'gist or sting' of the report—its very substance—is accurately conveyed." *McClatchy Newspapers, Inc.,* 189 Cal.

---

**5.** Vann alleged that he informed Henderson that "Third World (Arab) money was used to insure the election" of George Duekmejian as California's Attorney General in 1978. Vann also al-

leged that former Governor Jerry Brown, through a political aide, had fixed a narcotics case in Hawaii for $10,000.

App.3d at 975, 234 Cal.Rptr. 702. The article does this.

## C. *The Incremental Harm Doctrine*

█ Plaintiffs claim that even if the section 47(4) doctrine were to apply to the certain portions of the article in so far as they report the proceedings of the House Select Committee, other statements in the article, specifically paragraphs 18–20, are not privileged because they do not report on the proceedings of the House Select Committee. Plaintiffs argue that since paragraphs 18–20 are defamatory statements which are not privileged, summary judgment should be denied as to them.

Paragraphs 18–20 of the article involve telephone conversations made between the reporter Seper and plaintiffs. Seper telephoned plaintiff Henderson on June 10, 1984, and plaintiff Crane six weeks later on July, 27, 1984. Paragraphs 18–20 read:

Crane said he and Henderson talked about the allegations, the house request for an investigation and the Justice Department probe of them. He said Henderson told him Vann is "a kook."

Henderson, however, told *The Republic* he was not aware that specific allegations had been made against him, Crane or the Strike Force, that he had not talked to Crane about them and that he did not know that the House Select Committee had requested an investigation by the Justice Department.

"This is all news to me," he said.

Plaintiffs do not dispute the accuracy of these statements, but argue that the failure to provide the dates of these conversations leads readers to conclude that one of the two plaintiffs was lying about his knowledge of the investigation.

Assuming that these paragraphs are defamatory,[6] they are not actionable in light of the incremental harm doctrine. The incremental harm doctrine was recently adopted as law by the Court of Appeals for the Ninth Circuit in *Masson v. New Yorker Magazine, Inc.*, 881 F.2d F.2d 1452 (9th Cir.1989). "This doctrine measures the incremental reputational harm inflicted by the challenged statements beyond the harm imposed by the non-actionable remainder of the publication; if that 'incremental harm' is determined to be nominal or nonexistent, the statements are dismissed as not actionable." *Id.* at 1458. The doctrine was recognized first by the Court of Appeals for the Second Circuit in *Herbert v. Lando*, 781 F.2d 298, 310–11 (2d Cir.) *cert. denied*, 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986), holding that "statements ... should not be actionable if they merely imply the same view, and are simply an outgrowth of and subsidiary to those claims upon which it has been held there can be no recovery." *Id.* at 312.

Any incremental harm which may have been caused to plaintiffs as a result of paragraphs 18–20 is nominal and therefore not actionable. The possible inference that may be drawn by the reader that either Henderson or Crane was lying about his knowledge of the investigation does not impugn either plaintiff's reputation beyond the damage already suffered as a result of the privileged report of the House Select Committee proceedings. Therefore, under the incremental harm doctrine, paragraphs 18–20 are not actionable.

█ Nor are the remaining paragraphs actionable. Accurate quotation of public statements made by a plaintiff or statements that do not concern him are not defamatory. *Barger v. Playboy Enterprises, Inc.*, 564 F.Supp. 1151, 1153 (N.D. Cal.1983), *affirmed*, 732 F.2d 163 (9th Cir.), *cert. denied*, 469 U.S. 853, 105 S.Ct. 175, 83 L.Ed.2d 110 (1984) (plaintiffs must show that defamatory statements referred to them personally). Accordingly paragraphs 13–17 and 21–22 are not actionable. They merely contain plaintiff's denial of the alle-

---

**6.** Defendants argue that these statement are not defamatory because Seper simply reported two apparently contradictory statements. They argue that the situation "bristled with ambiguities" and the statement is not defamatory because Seper chose "one of a number of possible rational interpretations," citing *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 512–13, 104 S.Ct. 1949, 1966, 80 L.Ed.2d 502 (1984). The Court is unpersuaded by this argument. There was no ambiguity here.

gations and their attacks on Vann's credibility. Paragraphs 25–26 are not actionable as they refer to court records showing that the Strike Force relied on Vann's testimony. Paragraph 44 is not actionable as it states that Vann was returned to the federal witness program. Paragraph 23–24 are not actionable because they merely report Vann's claim that he testified for Henderson (not disputed). Paragraphs 8, 29, 31, 38 and 42 are not actionable because the merely provide a general description of the Strike Force and relate Seper's inability to obtain comment from certain individuals.

In summation, the Court finds that all references in the article to the House Select Committee investigation are privileged pursuant to California Civil Code section 47(4). Further, neither plaintiff has suffered any significant additional harm as a result of the remaining paragraphs which did not result also from the privileged paragraphs. Accordingly, summary judgment is granted in favor of defendants.

## II. Public Figures/Absence of Malice

There is an alternative reason for granting summary judgement in favor of the defendants as to plaintiff Henderson— plaintiff Henderson was a public figure at the time of publication and has not shown by clear and convincing evidence that defendants published the allegedly defamatory statements with actual malice.

### A. *Public Figures*

■ Whether a plaintiff was a public figure is a question of law. *Rosenblatt v. Baer*, 383 U.S. 75, 84, 86 S.Ct. 669, 675, 15 L.Ed.2d 597 (1966). At the time the article was published Henderson was head of the Los Angeles branch of the federal Organized Crime Strike Force. "[T]he 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt*, 383 U.S. at 85, 86 S.Ct. at 676. "[T]he term 'public official' now embraces virtually all persons affiliated with the government, such as most ordinary civil servants, including public school teachers and policeman." L. Tribe, *American Constitutional Law* section 12–12 at 866 (2d ed. 1988); *see also, Gomes v. Fried*, 136 Cal.App.3d 924, 933, 186 Cal.Rptr. 605, 610 (1982) (police officers are public officials). Henderson was clearly a public official.

Crane held the position of head of the Strike Force for 13 years before retiring into private practice. The article came out 9 years after Crane's retirement.

The article addresses Crane's activities *after* he left office. While defendant's have provided great authority for the proposition that statements regarding a former public official's performance of his duties *while in office* require a showing of malice to be actionable, no authority is presented for the proposition that statements regarding a former public official's activities engaged in after leaving the public post also require a showing of malice to be actionable. Indeed the language of the cases cited strongly indicate that the statements must relate to the former public officials activities *while in office*.[7]

Therefore, since the article refers to Crane's activities after he left public office, and since there is no evidence indicating that Crane had substantial responsibility for or control over the conduct of governmental affairs after his retirement, Crane was not a public figure for the purposes of this article.

---

7. *See e.g., Rosenblatt,* 383 U.S. at 87 n. 14, 86 S.Ct. at 677 n. 14 (fact that a former county recreation supervisor no longer held that position is of no "decisional significance" where the "interest in the way in which the *prior administration had done its task* continued strong") (emphasis added); *Pierce v. Capital Cities Communications, Inc.,* 576 F.2d 495, 510 (3d Cir.), *cert. denied,* 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978) (malice standard applies because "remarks in telecast were pertinent to his *official* conduct") (emphasis added); R. Smolla, *The Law of Defamation* § 2.25[2] at 2–89 ("lower courts have consistently refused to permit the passage of time to destroy public official status for speech relating to activities of the official *while in office*") (emphasis added).

B. *Clear and Convincing Evidence of Actual Malice*

Since Henderson was a public official, he must provide evidence of sufficient "caliber or quantity to allow a rational finder of fact to find actual malice by *clear and convincing evidence*" in order to survive defendants' motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). A defendant has acted with actual malice where "the defendant realized that his statement was false or that he subjectively entertained serious doubts as to the truth of his statement." *Bose Corp. v. Consumers Union of the United States Inc.*, 466 U.S. 485, 511 n. 30, 104 S.Ct. 1949, 1965 n. 30, 80 L.Ed.2d 502 (1984).

There is simply an insufficient basis for finding by clear and convincing evidence that defendants acted with malice. The House Select Committee on Narcotics Abuse and Control concluded that the allegations against Crane and Henderson were sufficiently meritorious for them to "urge ... [that] a vigorous investigation" be undertaken by the Department of Justice. That investigation had been underway for eight months when the article was published. Defendants reasonably relied upon these facts when they published the article containing the allegedly defamatory statements.

Despite defendants' reliance on the House Select Committee reports and recommendation to the Attorney General, plaintiffs contend that there is sufficient evidence to show by the clear and convincing standard, that defendants knew the article was false or had serious doubts about the allegations. They make five arguments to this effect.

First, plaintiffs contend that Seper knew that the House Select Committee reports did not say that both Henderson *and* Crane were "unusually soft on organized crime." As discussed above, however, this *is* the essence of the House Select Committee reports. This does not demonstrate malice.

Second, plaintiffs claim that paragraphs 18–20 are clear and convincing evidence of malice in light of the undisputed dates upon which these conversations occurred. The Court fails to see how the suggestion that either Henderson was lying about his knowledge of the investigation demonstrates that Seper did not believe the underlying allegations in the House Select Committee reports, unless plaintiffs are arguing that Seper's belief in the story was so badly shaken that he felt he needed to fabricate a lie on the part of the accused to bolster allegations made by Vann to the House Select Committee. Any inference of malice which could be drawn from this would not constitute clear and convincing evidence that Seper did not believe the allegations made in the House Select Committee documents.

Third, plaintiffs claim that Seper knew that the Strike Force did not have jurisdiction in Hawaii, yet published allegations found in the House Select Committee reports that plaintiffs were instrumental in suppressing certain prosecutions in Hawaii. Plaintiffs claim that Seper knew this was false, or entertained serious doubts about this, because both Crane and Henderson told Seper that the Strike Force did not have jurisdiction there. Plaintiffs essentially argue that their denials of wrongdoing alerted defendants to the falsity of the allegations. This is not a sufficient basis to alert a reporter to an allegation's falsity. *Edwards v. Nat'l Audubon Society, Inc.*, 556 F.2d 113, 121 (2d Cir.), *cert. denied*, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977) ("denials are so commonplace ... that ... they hardly alert the conscientious reporter to the likelihood or error"). Moreover, a jury would have to balance against these denials the fact that the House Select Committee urged a vigorous investigation by the Department of Justice into these allegations after the House Select Committee conducted its own investigation, and the fact that the Department of Justice was conducting an ongoing investigation into the allegations at the time the article was published. These facts would strongly militate against a finding of malice by clear and convincing evidence based on plaintiffs

representations to defendants that the Strike Force lacked jurisdiction in Hawaii.

Fourth, plaintiff Crane filed a declaration indicating that Seper told Crane that Crane's assertion that the Task Force did not have jurisdiction in Hawaii caused Seper to have serious doubts about the truth of the allegations.[8] However, Crane contradicted this statement in his declaration when he was subsequently deposed.[9] At the deposition Crane testified to the exchange Crane and Seper as follows:

> Crane: [Seper] agreed with the statement I said. I said this Vann's a nut or controversial. [Seper] said, "Yeah, I heard."

> • • • • •

> Defense counsel: Let me see if I understand. [Seper] said Vann is controversial and you responded by saying Vann is a nut, you better be very careful with him?

> Crane: Uh-huh. Words to that effect. That's the essence of it.

It seems obvious that Crane's assertions are not clear and convincing evidence that Seper knew Vann's allegations were false or that Seper entertained serious doubts about the allegations. At best, Crane's testimony indicates that Seper thought Vann was "controversial." Moreover, this does not show that Seper believed the allegations were false at the time he published them.

Fifth, plaintiffs allege that Seper's failure to investigate Vann's allegations demonstrates malice by clear and convincing evidence. During Seper's telephone conversation with Crane, Crane stated that a review of Crane's files would verify that Crane did not represent organized crime figures, contrary to the assertions in the House Select Committee documents that "Crane's clients are organized crime figures." Seper stated that he would not submit his story until after he had reviewed Crane's files. Seper submitted the story without making this investigation. Plaintiffs claim that failure to do so shows actual malice. The Court disagrees. Seper was relying upon documents of the House Select Committee of Narcotics Abuse and Control. Such reliance seems reasonable without further investigation. At best, Seper's failure to look at Crane's files would demonstrate negligence, not malice.

Thus, defendants are entitled to summary judgment as to plaintiff Henderson on the alternate ground that Henderson was a public figure at the time the article was published, and plaintiffs have failed to show that defendants acted with malice.

## III. The Neutral Reportage Doctrine

Finally, defendants claim that the article is protected under the "neutral reportage" doctrine. This privilege applies when the otherwise defamed person is (1) a public figure (2) involved in an existing public controversy, (3) the defamatory statement is made by a person to that controversy and (4) is republished accurately and neutrally. *Barry v. Time Inc.*, 584 F.Supp. 1110, 1127 (N.D.Cal.1984).

The Court of Appeals for the Ninth Circuit has neither adopted nor rejected this doctrine. Only the Court of Appeals for the Second Circuit in *Edwards v. National Audubon Society*, 556 F.2d 113, 115 (2d Cir.1977), and a handful of district courts have adopted the doctrine. Many courts have rejected the doctrine. *See* Note, *The Developing Privilege of Neutral Reportage*, 69 Va.L.Rev. 853, 863–65 (1983) (collecting cases). This court need not adopt or reject this doctrine in rendering its decision on this motion as the facts of this case render the doctrine inapplicable.

As discussed above, Crane was not a public figure. Therefore, the doctrine would not apply to the statements in the article as they relate to Crane.

---

**8.** Crane declares: "At the conclusion of my conversation with Seper, Seper stated that he had doubts about the veracity of the charges that had been made."

**9.** It should be noted that the contradiction between Crane's declaration and testimony will not create a genuine issue of fact which would frustrate summary judgment. *Lopez v. General Motors Corp.*, 697 F.2d 1328, 1333 (9th Cir.1983).

The doctrine is inapplicable to the statements in the article as they relate to Henderson (who was a public figure) for several other reasons. First, the doctrine only applies to reports regarding existing public controversies, not controversies which are made public by the publication. Thus in *McManus v. Doubleday & Co. Inc.*, 513 F.Supp. 1383 (S.D.N.Y.1981), the court held that the doctrine does not apply to investigative journalism reasoning that "including such journalist-induced charges within the protection of the privilege is unnecessary for promoting the purpose of [the doctrine—] the freer reporting of raging controversies...." *Id.* at 1391. While one might argue that in the present case there was a pre-existing controversy, it was shielded from the public eye until the article was published. Therefore, the article did not entail the reporting of a pre-existing "raging controversy." Accordingly, a secret government proceeding would not qualify as a "pre-existing public controversy" for the purposes of the neutral reportage doctrine. Therefore the neutral reportage doctrine does not apply.

At first blush, this may appear to contradict the Court's finding that a secret government proceeding could be a "public proceeding" under California's section 47(4) privilege. The distinction lies in the differing intents of the of the two doctrines. Section 47(4) is intended to promote the press' "watchdog" function over the activities of the government, whether public or secret. The intent of the neutral reportage doctrine on the other hand, is to promote "the public interest in being fully informed about *controversies* [involving public individuals] that *rage* around sensitive issues." *Barry*, 584 F.Supp. at 1124 (emphasis added). The individual is rightly given greater protection and privacy than is the government.

Second, the neutral reportage doctrine requirement that the republication be "accurate and neutral" appears to be a more demanding requirement than the "fair and true" requirement of section 47(4). Again, more latitude is given the press in their "watchdog" function over the government than is given the press in reporting the lives of public figures. Thus, under the neutral reportage doctrine, a report is not privileged if the republisher "espouses or concurs in the charges" or "deliberately distorts" the charges. *Edwards*, 556 F.2d at 120; *Barry*, 584 F.Supp. at 1127. As discussed above, Seper took some literary license in reporting the House Select Committee's activities. While some literary license is granted under section 47(4)'s "fair and true" test which requires merely that the report "capture of the substance" of the government proceeding, such license is not granted under the neutral reportage doctrine when reporting about a public individual. Therefore, the neutral reportage doctrine would not apply for this second reason.

Thus, the neutral reportage doctrine serves to promote freedom to report statements regarding public controversies which involve public figures. As it focuses on the reporting of the lives of individuals, rather than the activities of the government, it has more demanding requirements than does section 47(4). The Seper article does not meet these requirements. Therefore, this doctrine is inapplicable.

## IV. Plaintiffs' Emotional Distress Claim

Plaintiffs' claim for emotional distress is founded on the same facts as plaintiffs' defamation claims. As such, summary judgment must be granted as to this count if it is granted on the defamation claim. "Although the limitations that define the First Amendment's zone of protection for the press were established in defamation actions, they are not peculiar to such actions but apply to all claims whose gravamen is the alleged injurious falsehood of a statement: 'that constitutional protection does not depend on the label given the stated cause of action.'" *Blatty v. New York Times Co.*, 42 Cal.3d 1033, 1042, 232 Cal.Rptr. 542, 547, 728 P.2d 1177 (1986), *cert. denied*, 485 U.S. 934, 108 S.Ct. 1107, 99 L.Ed.2d 268 (1988) (*quoting, Reader's Digest Ass'n v. Superior Court*, 37 Cal.3d 244, 265, 208 Cal.Rptr. 137, 690 P.2d 610 (1984), *cert. denied* 478 U.S. 1009, 106 S.Ct. 3307, 92 L.Ed.2d 720 (1986)). Plaintiffs'

emotional distress claim is therefore dismissed.

For the reasons stated above, defendants' motion for summary judgment is granted.

IT IS SO ORDERED.

## EXHIBIT A

### The Arizona Republic

*Wednesday, August 1, 1984*

### U.S. crime strike force in LA accused of corruption

By Jerry Seper

Republic Staff

LOS ANGELES—The U.S. Justice Department is investigating allegations of corruption and misconduct by high-ranking officials of the federal Organized Crime Strike Force, *The Arizona Republic* has learned.

The probe, which is being conducted amid extraordinary secrecy, is aimed at James D. Henderson and Richard Crane, the current and former heads, respectively, of the strike force based in Los Angeles.

The Justice Department investigation was requested by a congressional committee in the wake of its own secret, four-month probe, and it was outlined in a confidential letter to Attorney General William French Smith from Rep. Charles B. Rangel, D–N.Y., chairman of the House Select Committee on Narcotics Abuse and Control.

"This committee recently received information concerning allegations of official corruption and dereliction of duty relating to narcotics enforcement in the Southwest area of the United States," Rangel wrote in the Nov. 15, 1983 letter, a copy of which has been obtained by *The Republic.*

"I bring this matter to your attention and strongly urge you to undertake a vigorous investigation."

The allegations of wrongdoing and misconduct involving strike-force officials were brought to the committee in September by a protected federal witness, Jerry Van, who is a former lieutenant of the Israeli Mafia in the Los Angeles area. This crime syndicate specializes in murder, arson, narcotics and pornography. The allegations are described in several confidential reports from committee investigators to Rangel and others.

Van told the committee that Henderson and Crane were "unusually soft on organized crime and corruption" and testified that he knew of instances in which the two men avoided prosecuting certain organized-crime figures operating in the strike force's five-state region, which encompasses Arizona, California, Nevada, Hawaii and New Mexico.

The strike force, which is within the Justice Department, coordinates federal, state and local law-enforcement agencies in cases against racketeers and mobsters, and prosecutes.

Van described the crime figures, including high-profile drug dealers and members of the Israeli Mafia, as "friends or associates" of the two prosecutors. He said Crane, who retired in 1977 after 13 years as head of the strike force, currently works for "the Las Vegas mob" and is involved in gambling interests in Nevada.

Photo
Omitted

James D. Henderson

*"This is all news to me."*

"Crane's clients are organized-crime figures," Van told committee investigator Sterling Johnson, according to a confidential memo. "When Crane's clients have problems with the Los Angeles strike force, they are rarely touched because the current chief, Jim Henderson, is a friend and former subordinate (of Crane)."

Photo
Omitted

Richard Crane

*"Untrue, unfounded and unfair."*

John T. Cusack, the committee's chief of staff, confirmed this week that the panel had requested the investigation. He described the allegations as "very serious and very comprehensive" but declined to be specific.

"We wouldn't have taken the trouble to write the letter if we didn't think there was a problem," Cusack said. "We just don't write letters like that every day."

Crane, who is in private practice in Los Angeles, said he was aware of the Justice Department's investigation but denounced the allegations as "untrue, unfounded and unfair."

"I never met Jerry Van, never had any (expletive) dealings with him and have no idea what he's (expletive) talking about," Crane said. "I have never represented any organized-crime figures, and I never asked Henderson to do a (expletive) favor for me or any of my clients."

He denied being actively involved in Nevada's gaming industry but acknowledged he is a part owner of the Barbary Coast Casino in Las Vegas. Nevada Gaming Commission records show Crane owns a 5 percent interest.

Crane said he attempted to find out about the Justice Department investigation when he learned of it a few weeks ago but was unable to get satisfactory answers from department officials or the House committee.

"This is no way to run a (expletive) investigation," Crane said. "I have a good reputation. Let's get it over with and get the results of it out."

Crane said he and Henderson talked about the allegations, the House request for an investigation and the Justice Department probe of them. He said Henderson told him Van is "a kook."

Henderson, however, told *The Republic* he was not aware that specific allegations have been made against him, Crane or the strike force, that he had not talked to Crane about them and that he did not know that the House committee had requested an investigation by the Justice Department.

"This is all news to me," he said.

Henderson denied any wrongdoing and accused Van of having a "personal vendetta" against him. He said Van, who is serving a 16–year prison sentence for assault, is not a credible witness.

"If the committee is listening to Jerry Van, they ought to consider whether or not he is a credible witness," Henderson said. "And I can tell you that he is not."

Van, located at a federal prison where he is being held in the government's witness-

protection program, challenged Henderson's claim that he is not credible.

"I testified several times for Jim Henderson," Van said. "I was his star witness more than once. I guess you could say I am credible only when it is convenient for the government."

Records show that Van has been used by strike-force prosecutors and others in numerous cases as a witness during trials and before various grand juries. His testimony has been instrumental in winning 10 convictions of organized-crime figures in cases ranging from murder to racketeering, the records show.

During a September 1982 hearing in Los Angeles County Superior Court, strike-force prosecutor Paul Corridini testified that Van had been used often as a witness, and that he was "100 percent truthful and had a unique amount of knowledge about the criminal activities" of the Israeli Mafia and other crime groups.

Cusack said Van's allegations, along with information his staff was able to gather, indicate that "much more than just narcotics enforcement is involved" in the alleged improprieties.

Cusack said he learned "unofficially" last month that Justice Department investigators "are talking to people now," but he said he doesn't know who has been questioned because no one from the department has discussed the case with the committee.

Department officials refused to comment.

A confidential letter to Rangel from Michael E. Shaheen, an attorney in the department's Office of Professional Responsibility, however, said an investigation was begun Nov. 28, 1983, and that the committee would be advised of the results once it was concluded.

Shaheen failed to respond to several telephone inquiries. Rangel has not returned repeated telephone calls.

The request for a Justice Department investigation came after the House committee began its own inquiry into the allegations, committee records show. That investigation, according to the records, continued for at least four months.

A confidential memo dated Jan. 30 said many of Van's allegations had been "substantiated" during the committee's secret inquiry. The memo, a copy of which has been obtained by *The Republic*, outlined an interview with a law-enforcement official in Hawaii, who was described as being knowledgeable about the activities of the Los Angeles-based strike force.

The official, Donald Cartensen, an investigator with the Honolulu city prosecuting attorney's office, was quoted by committee investigators as saying he was "concerned and shocked" by the number of "strong cases" that had been dismissed by strike-force attorneys in Los Angeles.

Cartensen told the committee's chief counsel, Richard B. Lowe, and investigator John Capers, that cases· involving well-known, high-profile drug traffickers working with entertainers and organized-crime figures either had been dismissed or never brought to trial and that he did not know why.

A September memo from committee investigator Johnson to Cusack, chief of staff for the House committee, also described an interview with Hal Glickman, a Los Angeles bail bondsman who recently completed a prison term for attempting to bribe a federal judge.

Glickman, according to the memo, claimed that strike-force prosecutors had been paid bribes by Los Angeles-area mobsters, but he refused to cooperate with the committee's investigation. He said that if he cooperated with the government, "a lot of people would get hurt."

Glickman was not available for comment.

Van was found guilty in June 1979 of two counts of assault with a deadly weapon, two counts of assault, attempted extortion and conspiracy to commit extortion. He was identified in court records as the "right-hand man" of reputed Israeli Mafia boss Adel "Eddie Nash" Nasiallah.

Van agreed to cooperate with federal prosecutors in cases against other orga-

nized-crime figures in return for a reduction in his 16–year sentence. He is scheduled to be paroled in June 1985.

Shortly after Van appeared before the committee, he was transferred from the government's witness-protection program into the prison's general population, a move that some—including Rangel—felt had placed Van's life in jeopardy.

The protected-witness unit houses prisoners who have testified against others, often high-ranking organized-crime figures, and are considered at risk of being killed in reprisal for their testimony.

"Shortly after Mr. Van made these allegations, he was transferred from protective custody into the general prison population," Rangel wrote in his confidential letter to Smith. "While I do not want to draw conclusions from this act, it raises certain questions, particularly, what conditions have changed that would diminish the need for Mr. Van to be under witness protection."

Van was returned to the protected-witness unit shortly after the letter was received by the Justice Department.