BLUMENFELD, J.,*
Dissenting.—Alter strenuously, repeatedly, and successfully arguing at trial that the case was not about the quality of the pipes sold by J-M Manufacturing Company, Inc. (J-M), and after obtaining a jury verdict based on its argument that it did not have to prove that a single piece of pipe was faulty, Phillips & Cohen LLP published a press release touting that the jury had found J-M liable “for making and selling faulty water system pipes.” The headline read in full: “[J-M] faces billions in damages after jury finds [J-M] liable for making and selling faulty water system pipes.” The headline framed the story, which Phillips & Cohen then proceeded to tell with lawyer-like skill, crafting a press release manifestly designed to convey an impression of bursting pipes and crushing liability.
The majority concludes that the press release is a fair and true report of the jury verdict as a matter of law. I respectfully disagree with that conclusion for three reasons. First, when a publication is susceptible of a defamatory meaning, jurors rather than judges must decide the question. An average *106 reader readily could perceive the press release to mean what Phillips & Cohen set out to communicate. Second, the question whether a publication is susceptible of a defamatory meaning depends on the totality of the circumstances. That is, the meaning of challenged statements must be viewed in the context of the entire publication to gauge the probable impact of the communication on the average reader. Under this test, the press release cannot be divided into several distinct parts (Maj. opn., ante, at p. 101), as this results in minimizing the troubling statements and overlooking their contribution to the overall story. Third, the literary license doctrine did not permit Phillips & Cohen to falsely insinuate that the jury had found J-M’s pipes to be defective. This important doctrine provides breathing space for freedom of expression, but it does not operate to smother protections afforded by the defamation laws.
In the end, the majority finds that “Phillips & Cohen may be guilty of self-promotion and puffery”—hut nothing else. (Maj. opn., ante, at p. 105.) Perhaps. I believe, however, that any such verdict should be rendered by a jury. Like the trial judge in this case, I would hold that an average reader could interpret the press release to mean precisely what the headline stated: “[The] jury [found J-M] liable for making and selling faulty water system pipes.” For this reason, I would affirm the trial court and allow a jury to decide whether Phillip & Cohen’s press release was a fair and true report. Therefore, I respectfully dissent.
I
Before analyzing the defamation and trade libel claims, it is important to understand not only what the jury decided in the federal lawsuit, but also what the jury did not decide in that case. A proper understanding of the jury verdict exposes the defamatory nature of the press release.
A
The federal lawsuit was a qui tarn action involving J-M’s certification to government entities that the pipes sold conformed to two industry standards—one established by the American Water Works Association (AWWA) and the other established by the Underwriters Laboratories (UL). The focus of the standards is on strength and durability with the goal of producing pipes with an expected life-span of 50 to 100 years. To satisfy the standards, J-M was required to manufacture its pipes using a process designed to achieve uniform compliance.
At the repeated urging of Phillips & Cohen, the liability phase of the trial of the qui tarn action had a narrow scope. The court’s bifurcation order *107 explained Phillips & Cohen’s theory of the case: “J-M falsely represented that (a) all (not just some) J-M pipe satisfied the requirements, rules, and standards of [AWWA and UL] . . . ; and (b) all (not just some) of the pipe was manufactured in a substantially identical manner to the pipe that was originally determined to comply with the standards. . . .” The jury instructions also explained the limited focus of the trial: “Plaintiffs contend that J-M represented that every piece of PVC pipe it sold was manufactured and tested in accordance with applicable industry standards. Plaintiffs contend that this representation was false because J-M did not manufacture or test its pipe in a manner that assured it uniformly had the quality, strength, or durability that the applicable industry standards require.”
The jury was not asked to consider whether J-M manufactured and sold faulty pipes. Phillips & Cohen told the district court that the plaintiffs “never considered [pipe] failures to be a big part of this case,” and that “the question before the jury was not [whether] the pipe [is] defective, it was not whether the pipe failed, the question before the jury is were the defendants . . . truthful . . . .” Phillips & Cohen told the jury the same thing. In its rebuttal closing argument, Phillips & Cohen bristled at defense counsel’s suggestion that the case was about “substandard products,” arguing: “So let me start with the thing that [defense counsel] just told you that I was absolutely stunned to hear. He told you there’s no evidence the plaintiffs here got substandard pipe so they shouldn’t recover. . . . Ladies and gentlemen, look at the jury instructions. The court will never instruct you anywhere that we have to show we got substandard pipe. This is not a products liability case. This is a False Claims Act case. All we need to show is that J-M misrepresented its products to our clients .... It is about false statements. It is not. . . about substandard products and we do not have to show that ... to prevail.”
Phillips & Cohen was successful in framing the issue before the district court and persuading the jury that it should prevail on the issue as framed. At the end of the first phase of the trial, the jury rendered a special verdict in favor of the plaintiffs, concluding that J-M submitted false claims to the five representative plaintiffs. Significantly, the special verdict form required the jury to explain why the claims were false. The jury specifically disclosed its finding: “[J-M] falsely represented uniform compliance with AWWA [C900 and] C905 and UL 1285.”[1]
*108 The jury did not make any other findings, let alone that J-M had made and sold faulty pipes. In fact, even after the verdict, Phillips & Cohen emphasized the narrow limits of the jury’s decision. In opposing J-M’s post-trial motions, Phillips & Cohen argued that the jury decided that J-M’s statements were false because J-M did not achieve “uniform compliance” with the AWWA and UL standards in manufacturing the pipe. Phillips & Cohen conceded that it did not show that the pipes the plaintiffs received fell below the AWWA and UL standards, but reminded the district court of its earlier finding that the plaintiffs were only required to “ ‘show that [compliance is] less than 100 percent’ ” in manufacturing the pipe. (Italics omitted.) The district court did not require the plaintiffs to “ ‘prove that [the plaintiffs’] pipe is substandard.’ ”
Phillips & Cohen also explained the significance of J-M’s false claim of uniform compliance. “What [the] [plaintiffs purchased, J-M promised, and the standards guaranteed was a regime of overall consistency in which the customer can have confidence that the pipe’s long-term strength and durability is no less than the qualifying samples.” The lack of uniform compliance “deprived [the] [plaintiffs of the assurance of quality [that] they had contracted for” and caused their pipes to face a “heightened risk of premature failure.” In other words, the lack of uniform compliance increased the risk that the plaintiffs may have obtained non-compliant pipes, and if the plaintiffs did receive non-compliant pipes, this would increase the risk that those pipes might fail prematurely.
So what was the risk that the plaintiffs had bought non-compliant pipes? The jury did not say. And what was the risk of a premature failure if the plaintiffs had purchased non-compliant pipes? The jury did not say. Did the jury at least say that the effect of noncompliance would be to reduce the expected life of the pipe by no less than one year—from 50 to 100 years to 49 to 99 years? The jury did not say. Nor did the jury have any way of knowing, because the plaintiffs did not introduce evidence that would have permitted an informed answer to all these questions.
B
Despite the narrow findings of the jury, Phillips & Cohen issued a press release the day after the verdict that described those findings in broad-sweeping terms. According to the headline: “[J-M] faces billions in damages after jury finds [J-M] liable for making and selling faulty water system pipes.” After describing the jury’s findings in unmistakable language, Phillips & Cohen repeatedly used words that reinforced the headline about faulty pipes, referring to J-M pipes as “ ‘substandard,’ ” “ ‘shoddy,’ ” “bad,” and in need of replacement “much sooner than expected” after “a decade of failing test results.”
*109 The press release stated that “[a] federal jury unanimously agreed last night that [J-M] . . . knowingly manufactured and sold to government entities substandard plastic pipe that was used in water and sewer systems in various states around the country—opening [J-M] up to potentially billions of dollars in damages. [¶] . . . The trial exposed [J-M’s] deliberate efforts to cut costs by using shoddy manufacturing practices to make weaker but more profitable polyvinyl chloride (PVC) pipe.” According to the press release, “ ‘States and water districts that are covered by this lawsuit spent $2.2 billion to buy [J-M pipe] during the 10-year period [J-M] was lying about the long-term strength of the pipe,’ said Eric Havian, an attorney with Phillips & Cohen .... ‘Those entities now are entitled to recover a substantial portion of that cost plus the cost to replace the shoddy pipe much sooner than expected. This likely will mean damages could total billions of dollars because it’s expensive and disruptive to replace water pipe.’ [¶] . . . [¶] ‘[J-M] defrauded its customers for 10 years,’ Havian continued. ‘The jury decided that [J-M] management cared only about the amount of pipe [J-M] produced, not the quality of that pipe. [J-M] deceived outside inspection agencies and ignored over a decade of failing test results. . .
The press release then reported comments about the jury verdict from four high-ranking officials from different states. The Nevada Attorney General stated: “ ‘The PVC pipe has already failed across the Silver State and will have to be replaced sooner than expected .... We know from firsthand experience that this PVC pipe will prematurely leak or break and can jeopardize lives. Today’s verdict demonstrates that manufacturers cannot get away with fraud that puts lives at risk. . . .’ ” The Virginia Attorney General stated: “ ‘The trial showed the company’s attempt to cut costs with shoddy manufacturing practices resulted in weaker PVC pipes, which ended up leaking and costing Virginia localities millions to repair or replace. . . .’ ” The New Mexico Attorney General stated: “ ‘[J-M] defrauded New Mexico taxpayers when [it] sold us sub-standard products that jeopardize our citizens’ access to clean drinking water. . . .’ ” The San Diego City Attorney praised the verdict for holding J-M “ ‘accountable for supplying substandard products to our city.’ ”
The remaining part of the press release described the trial. It referred to the case as a ‘“whistleblower lawsuit” that was divided into two phases and explained: ‘“The first trial determined whether from 1996 to 2006 [J-M] lied about whether its pipe met strength and durability standards required by government specifications, thereby making it liable for damages under state and local false claims laws.” ‘“A separate trial will be held to determine the amount of damages” for the costs to replace failed pipes and to replace pipes sooner than expected.
*110 II
The critical question in this case is whether this court can conclude as a matter of law that the press release is privileged as a fair and true report. (Civ. Code, § 47, subd. (d).) Under well-established authority, a jury must decide this privilege issue unless the undisputed facts permit “but one conclusion”— i.e., the press release is not susceptible of a defamatory meaning in the mind of an average reader. (Frisk v. Merrihew (1974) 42 Cal.App.3d 319, 326 [116 Cal.Rptr. 781]; see MacLeod v. Tribune Publishing Co. (1959) 52 Cal.2d 536, 546 [343 P.2d 36] (MacLeod) [“Whether or not the article is reasonably susceptible of this interpretation is a question for the court and, if so, whether or not it was so understood is a question for the jury.”].) The majority acknowledges this principle, but ultimately departs from it. This departure marks a substantial expansion of the role of a court in deciding defamation cases.
The court in Frisk articulated the principle well: “[T]he cases uniformly hold that even though a [defendant] in the first instance establishes the existence of a privileged occasion for a defamatory publication, he may nevertheless be subject to liability if [the] plaintiff persuades the fact finder that the occasion was abused. The question of whether a privileged occasion was abused is for the determination of the jury unless the facts permit but one conclusion. [Citations.]” (Frisk v. Merrihew, supra, 42 Cal.App.3d at p. 326.) This has long been the law in California. (MacLeod, supra, 52 Cal.2d at p. 546; see Burrill v. Nair (2013) 217 Cal.App.4th 357, 398 [158 Cal.Rptr.3d 332] [“ ‘[w]hether or not a privileged occasion exists is for the court to decide, while the effect produced by the particular words used in an article [or broadcast] and the fairness of the report is a question of fact for the jury’ ”]; Pierce v. San Jose Mercury News (1989) 214 Cal.App.3d 1626, 1634 [263 Cal.Rptr. 410] [“Where . . . reasonable minds could disagree on what is fair, the issue is a question of fact to be determined by the jury.”]; Handelsman v. San Francisco Chronicle (1970) 11 Cal.App.3d 381, 386 [90 Cal.Rptr. 188] [“The applicable law in California is that whether or not a privileged occasion exists is for the court to decide, while the effect produced by the particular words used in an article and the fairness of the report is a question of fact for the jury.”]; accord, Jennings v. Telegram-Tribune Co. (1985) 164 Cal.App.3d 119, 128 [210 Cal.Rptr. 485] [privilege issue can only be decided as a matter of law if the average reader would not understand the publication to have the meaning asserted by the plaintiff].)
The majority suggests that the court-jury divide strongly tilts in the court’s direction. It states that while the privilege issue “may properly be left to a jury in some instances, appellate courts have not been reluctant to decide the fair report privilege applies as a matter of law when the undisputed facts are *111 insufficient to support a judgment for the plaintiff.” (Maj. opn., ante, at p. 99.) For this proposition, the majority cites two distinguishable cases that correctly found the privilege applied as a matter of law. In Kilgore v. Younger (1982) 30 Cal.3d 770, 774, 777 [180 Cal.Rptr. 657, 640 P.2d 793], two newspapers accurately noted that the plaintiff was fisted in the California Attorney General’s report as one of 92 individuals who were suspected of having engaged in a variety of organized criminal activity. The court rejected the plaintiffs contention that, for the privilege to attach, the newspapers had to identify his specific activities to avoid the implication that he was involved in every single criminal activity that happened to be mentioned in the report. In Jennings v. Telegram-Tribune Co., supra, 164 Cal.App.3d at page 122, a newspaper reported that the plaintiff was convicted of “ ‘tax fraud’ ” and “ ‘tax evasion,’ ” when describing his misdemeanor plea to knowingly fail to file income tax returns for years on more than $400,000 in income. The court found the article was privileged as a matter of law because it accurately described the gist of the criminal proceeding. (Id. at p. 127.) Thus, Kilgore and Jennings properly concluded that the facts in those cases were susceptible of a privileged interpretation only.
Where, as here, the facts are susceptible of a nonprivileged interpretation, a court may not decide the case as a matter of law. Indeed, courts have allowed juries to decide privilege questions in cases with publications far less troubling than the press release here. In Handelsman, for example, a newspaper reported on a civil complaint that had been filed against the plaintiff in San Mateo, charging that he and others had conspired to convert union dues to their own use. The plaintiffs sued the newspaper for describing the civil complaint as having accused him of “ ‘outright theft.’ ” (Handelsman v. San Francisco Chronicle, supra, 11 Cal.App.3d at p. 387.) The court did not decide as a matter of law that the newspaper article was a fair and true report of the civil action filed against the plaintiff. Instead, the jury was allowed to decide this question and found the privilege attached. (Id. at p. 386.) On the plaintiff’s appeal, the court affirmed the judgment for the newspaper, stating: ‘“[A]lthough the San Mateo action is civil in nature, the use of the criminal term ‘theft’ in describing the facts alleged in the complaint might well be within the ambit of fair reporting. At least, the court is not inclined to hold that the reporting was not fair as a matter of law.” (Id. at p. 388.)
Handelsman does not stand alone. (See also MacLeod, supra, 52 Cal.2d at p. 547 [jury could find that the newspaper insinuated the ‘“plaintiff was unworthy of public office because he was a communist sympathizer”]; Burrill v. Nair, supra, 217 Cal.App.4th at p. 398 [jury must decide the privilege question because the average listener might understand the gist of the broadcast to have a defamatory meaning]; Pierce v. San Jose Mercury *112 News, supra, 214 Cal.App.3d at p. 1634 [“Where, as here, reasonable minds could disagree on what is fair, the issue is a question of fact to be determined by the jury.”].)
Ill
Phillips & Cohen argues that the press release is a fair and true report as a matter of law by misapplying controlling principles of interpretation. In the name of the totality of the circumstances test, Phillips & Cohen urges a “divide and conquer” approach that distorts rather than illuminates the effect of the entire story. In the name of the literary license doctrine, Phillips & Cohen requests a level of “flexibility” that stretches the doctrine beyond its intended limits.
A
To qualify as a fair and true report of an official proceeding, a publication must “capture[] the gist or sting of the statements made” therein. (Balzaga v. Fox News Network, LLC (2009) 173 Cal.App.4th 1325, 1337 [93 Cal.Rptr.3d 782].) When a plaintiff claims that the report is defamatory, “the courts apply a totality of the circumstances test to review the meaning of the language in context and whether it is susceptible of a meaning alleged by the plaintiff.” {Ibid.) In applying this test, a court must remember that “the publication is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader.” (MacLeod, supra, 52 Cal.2d at pp. 547, 551.) Equally important to remember is that “[a] defendant is liable for what is insinuated, as well as for what is stated explicitly.” {Ibid.)
The totality of the circumstances test is deeply rooted in the law. The purpose of the test, in all its applications, is to try to see the entire picture by considering all the relevant facts collectively. Once the picture emerges, the question is whether the applicable standard has been met. Translated here, the test requires a court to consider the challenged statements in the context of the entire publication to determine the natural and probable effect on the average reader. (Balzaga v. Fox News Network, LLC, supra, 173 Cal.App.4th at p. 1337.) A defendant in a defamation case is only entitled to judgment as a matter of law if a court, after correctly applying the totality of the circumstances test, can declare that the probable effect is unquestionably nonde-famatory. (Id. at p. 1339; accord, MacLeod, supra, 52 Cal.2d at p. 547.)
A proper application of the test precludes what the United States Supreme Court has rejected as a “divide-and-conquer analysis.” (United States v. Arvizu (2002) 534 U.S. 266, 274 [151 L.Ed.2d 740, 122 S.Ct. 744].) Such an *113 analysis is irreconcilable with the test because it serves to undermine it, producing distortion rather than clarity. The majority appears to employ this analysis, stating: “The press release covers four related, but distinct topics: the trial, the verdict, the legal consequences of the verdict (J-M’s potential liability for damages) and the postverdict reaction of several government officials.” (Maj. opn., ante, at p. 101.) The division of the press release into four distinct parts has the effect of isolating and minimizing the false statements.
Starting with the headline, the majority states that “the adjective ‘faulty’ considered in isolation could suggest the pipes sold contained manufacturing flaws that made them unserviceable.” (Maj. opn., ante, at p. 102.) This is more than a suggestion—it is the plain meaning of the story’s headline. Yet the majority concludes that “the headline is a reasonable characterization of the jury’s findings” because the body of the press release contains some correct statements. {Ibid.) Specifically, the press release noted that the jury determined that J-M had “lied about whether its pipe met strength and durability standards,” that “the trial focused on those . . . five government entities that were selected from the larger group,” and that “[a] separate trial will be held to determine the amount of damages.” This is the entire context upon which the majority relies in declaring the headline to be accurate. But the fact that J-M “lied about whether its pipe met strength and durability standards” reasonably could be construed as adding rather than subtracting a fact—i.e., J-M not only sold the government faulty pipes, but it lied to the government about them as well. The other general facts about the trial—that it focused on five government entities and contained a separate damages phase—do nothing to erase the headline’s plain meaning.
Phillips & Cohen also claimed that “[t]he trial exposed” J-M’s “shoddy manufacturing practices” that produced “shoddy pipe.” According to the majority, those terms described the trial evidence rather than the jury’s verdict. But an average reader reasonably would have understood the jury’s verdict to have been based on the evidence. Aside from missing the connection between the evidence and the verdict, this analysis also overlooks the nexus between the headline and the body of the story. The body’s description of “shoddy pipe” served to fortify the impression created by the headline’s description of “faulty water system pipes.” The same is true for the other parts of the press release, including the reference to “billions of dollars in damages” for manufacturing and selling faulty pipes, the statement that J-M did not care about “the quality” of its pipes, and the reports of failing water systems from government officials.
Under a proper application of the totality of the circumstances test, the press release readily can be understood to mean what its headline plainly *114 stated. The headline introduced the story, informing the reader that he or she would be reading about a jury verdict finding J-M liable for “making and selling faulty water system pipes,” thereby exposing J-M to “billions of dollars in damages.” Phillips & Cohen then developed that general theme throughout the press release. The first sentence stated: “A federal jury unanimously agreed last night that [J-M] . . . manufactured and sold to government entities substandard plastic pipe that was used in water and sewer systems . . . .” In selecting the word “substandard,” Phillips & Cohen knew exactly what it was doing. In closing argument to the jury, Phillips & Cohen claimed that it was “absolutely stunned” to hear any reference to “substandard” pipes. Worried about the probable effect of the use of this word on the jury, Phillips & Cohen strenuously reminded the jurors: “This is not a products liability case. ... It is not .. . about substandard products . . . .” Clearly, Phillips & Cohen understood the implication of calling pipes “substandard” even before a jury that had received weeks of education about the False Claims Act (Gov. Code, § 12650 et seq.) and industry standards, and even without a prior thematic reference to the pipes as being “faulty.”
Not content with the use of the word “Faulty” in the headline and “substandard” in the first sentence, Phillips & Cohen continued in the next few paragraphs to create an image of defective pipes by stating that J-M used “shoddy manufacturing practices” to make “weaker” and “shoddy pipe” that will have to be replaced “much sooner than expected.” Phillips & Cohen then gave an example of what it was talking about: “For instance, [a municipal water district in California] had to spend $4 million to replace [J-M] pipe after the water pipe that was part of one project broke and leaked seven times.” Yet the majority concludes that an average reader could not understand the press release to suggest that J-M pipe was defective, but only that the pipe might have to be replaced “sooner than the 50-100 years anticipated by the industry’s durability standard to which J-M had falsely certified.” (Maj. opn., ante, at p. 104.) Given that the press release never explained the significance of the industry standards as found by the jury, this conclusion demands an awful lot from an average reader.[2]
But Phillips & Cohen was not done spinning its story. After giving an example of a failing water system caused by faulty pipes, the press release explained that “ ‘[t]he jury decided that [J-M] cared only about the amount of pipe [it] produced, not the quality of that pipe.’ ” In the very next sentence, *115 the press release informed the reader that J-M “ ‘ignored over a decade of failing test results.’ ” The juxtaposition of these two sentences was as clever as it was clear: Phillips & Cohen was insinuating that J-M has been manufacturing defective pipes that have been failing tests for over a decade.
And if the insinuation were not obvious enough, Phillips & Cohen—taking no chances that its intended message would be lost on the average reader— offered testimonials from various government officials about their allegedly faulty pipes. Before turning to the testimonials, the press release noted: “Nevada was one of the largest purchasers of [J-M] pipe and experienced many failures of that pipe.” The Nevada Attorney General was then quoted to say that the “ ‘pipe has already failed across the Silver State and will have to be replaced sooner than expected,’ ” and that she “ ‘know[s] from firsthand experience that this PVC pipe will prematurely leak or break and can jeopardize lives.’ ” The Virginia Attorney General was next quoted about having bought “ ‘substandard pipes for their water and sewer systems’ ” and explained: “ ‘The trial showed the company’s attempt to cut costs with shoddy manufacturing practices resulted in weaker PVC pipes, which ended up leaking and costing Virginia localities millions to repair or replace.’ ” The remaining officials repeated the same theme that J-M had sold a defective product that endangered the health and safety of their communities.
B
Having distorted the jury’s findings, Phillips & Cohen cannot seek refuge in the literary license doctrine. That doctrine does not permit Phillips & Cohen to falsely suggest that the jury found J-M pipe to be faulty or defective.
A report is fair and true if it accurately describes the substance, or gist, of the reported matter. (Reader’s Digest Assn. v. Superior Court (1984) 37 Cal.3d 244, 262, fn. 13 [208 Cal.Rptr. 137, 690 P.2d 610].) A publisher is not required to quote the source of the information verbatim. {Ibid.) In this sense, a publisher has a “literary license” to use words that fairly and accurately express the meaning of what was stated or done. (Ihid.) The need for this license is obvious: a reasonable amount of “ ‘ “breathing space” ’ ” is necessary to protect freedom of expression. (Id. at p. 261.) The limits of this license are equally obvious—the license does not justify altering or distorting the gist of the matter reported on. {Id. at p. 262, fn. 13.) The line is crossed if the publication is such a departure that it “ ‘ “produce [s] a different effect” on the reader.’ ” (Carver v. Bonds (2005) 135 Cal.App.4th 328, 351 [37 Cal.Rptr.3d 480].)
A reasonable jury could find that Phillips & Cohen crossed that line here. As discussed, the press release did not merely use exaggerated language in an *116 otherwise accurate description of what the federal jury had found. Rather, Phillips & Cohen used language to create a false impression of the jury’s findings by manipulating language and interlacing truth with fiction. In doing so, Phillips & Cohen strayed far from the limited reach of the license. (See McClatchy Newspapers, Inc. v. Superior Court (1987) 189 Cal.App.3d 961, 975-976 [234 Cal.Rptr. 702] [applying the doctrine after noting that the report was “completely accurate” and that the license authorizes “a degree of flexibility” so that “[t]he reporter is not bound by the straitjacket of the testifier’s exact words”].) Granting a license to Phillips & Cohen in these circumstances thus comes at a considerable cost—namely, the weakening of the protections afforded by the defamation laws.
IV
Phillips & Cohen published a press release that sought to convey indirectly, if not directly, that a jury had found that J-M’s pipes were defective. The press release, as a whole, is anything but subtle—the headline sets the narrative and the body feeds it. The legal artistry appeared in the words chosen in the body and the accompanying use of testimonials. But such artistry, achieved by selective use of language designed to skirt around the edges of the law of defamation, is not sufficient to avoid the consequences of the clearly insinuated message. (MacLeod, supra, 52 Cal.2d at pp. 550-551.)
Justice Traynor long ago cautioned against allowing this type of linguistic manipulation: “Such hair-splitting analysis of language has no place in the law of defamation, dealing as it does with the impact of communications between ordinary human beings. It is inconsistent with the rule that ‘the publication is to be measured not so much by its effect when subjected to the critical analysis of a mind trained in the law, but by the natural and probable effect upon the mind of the average reader.’ [Citation.] It protects, not the innocent defamer whose words are libelous only because of facts unknown to him, but the clever writer versed in the law of defamation who deliberately casts a grossly defamatory imputation in ambiguous language.” (MacLeod, supra, 52 Cal.2d at pp. 550-551.)
By escaping a trial in this case—and thus even the potential for liability— Phillips & Cohen has paved a path for those who wish to follow. Because I believe that this is the wrong path, I respectfully dissent.
A petition for a rehearing was denied May 18, 2016, and respondent’s petition for review by the Supreme Court was denied July 27, 2016, S235171.

Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

 In proving that J-M falsely certified compliance with the industry standards, the plaintiffs did not produce evidence that any of their' pipes failed to comply with those standards. On the contrary, they acknowledged that they could not do so because their pipes were buried underground and unavailable for strength testing. Instead, the plaintiffs sought to prove that the certifications were false by focusing on J-M’s warranties about uniform compliance in the manufacturing and testing processes.

 The press release referred only in passing to “ ‘hundred-year pipe.’ ” Even then, the reference merely served to reinforce the theme of defective and failing pipes, stating that one of the plaintiffs “has already spent millions of dollars to replace fairly new [J-M] water pipes that failed, despite being considered ‘hundred-year pipe.’ ” The press release then stated that J-M had created incentives for its employees to deliver “bad pipe,” and that “plant managers routinely removed ‘reject’ tags from pipe that quality control personnel had identified as failing to meet quality standards.”